(122 App. Div. 203.)

TRUSTEES OF VILLAGE OF SARATOGA SPRINGS v. SARATOGA GAS, ELECTRIC LIGHT & POWER CO.

(Supreme Court, Appellate Division, Third Department. November 20, 1907.)

1. CONSTITUTIONAL LAW—LEGISLATIVE POWER—REGULATION OF RATES OF PUBLIC SERVICE CORPORATION.

The power to establish a tariff of rates for a public service corporation is a legislative, and not an executive or judicial, function.

2. SAME—DELEGATION OF POWERS.

The legislative function of fixing a tariff of rates for a public service corporation may be delegated to an administrative body, with power to fix rates in conformity with a standard established by the Legislature.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 89–102.]

3. SAME—LEGISLATIVE DISCRETION OF ADMINISTRATIVE BODY—STATUTES.

Laws 1905, p. 2092, c. 737, establishing the commission of gas and electricity, and authorizing it to fix, after hearing, "within the limits prescribed by law," the maximum price for gas and electricity furnished by any public service corporation, is not invalid on the ground that the determination of the commission is not controlled by a standard prescribed in the statute, and no legislative discretion is delegated to the commission, since the quoted words fix the standard, by requiring that the rates shall be reasonable to the public and to the corporation, or, if it be conceded that the quoted words do not add anything to the statute, the commission must be guided by the common law.

**4. SAME.**

The Legislature has power to authorize the commission of gas and electricity, created by Laws 1905, p. 2092, c. 737, and empowered to fix maximum rates for gas and electricity furnished by any public service corporation, to receive ex parte and hearsay evidence, and to base its decision thereon, although the review provided for is only by appeal from a determination so made.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 89–102.]

**5. SAME—DUE PROCESS OF LAW.**

To make effectual the constitutional guaranty of due process of law, one must have the right to appeal to the court whenever it is claimed that his constitutional rights are invaded.

**6. SAME.**

Laws 1905, p. 2092, c. 737, creating the commission of gas and electricity, with power to fix maximum rates for gas and electricity furnished by any public service corporation, is not invalid as depriving a corporation of its property without due process of law, though the remedy of appeal from a determination of the commission may not be adequate to preserve to the corporation the constitutional protection, since it has the concurrent remedy of injunction to restrain the enforcement of any improper order of the commission.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 925–929.]

**7. STATUTES—CONSTRUCTION—INVALIDITY IN PART.**

The court must so construe a statute, if possible, as to make it conform to constitutional requirements, and must disregard such parts of it as are in violation of the Constitution, where the statute is separable and a substantial part thereof was lawfully enacted.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Statutes, §§ 58–66.]

**8. CONSTITUTIONAL LAW—EQUAL PROTECTION OF THE LAW.**

Laws 1905, p. 2092, c. 737, creating the commission of gas and electricity, with power to fix maximum rates for gas and electricity furnished by any public service corporation, is not invalid on the ground that the provision that the price fixed by the commission shall be the price for a term of three years, and thereafter until, on complaint, the commission shall fix a new price, denies to such a corporation the equal protection of the law, in that it makes a rate which may within three years become confiscatory by reason of an increase in price of materials used in making gas and electricity, since the corporation may in such a case either appeal to the Legislature or to the courts for relief.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 691, 847.]

**9. GAS—RATES—ESTABLISHMENT BY COMMISSION—REVIEW.**

The court, in determining whether the rates for gas and electricity furnished by a public service corporation, as fixed by the commission of gas and electricity created by Laws 1905, p. 2092, c. 737, are reasonable, must presume in favor of the validity of the order of the commission.

**10. SAME.**

The stockholders of a public service corporation furnishing gas and electricity are not entitled to require the public to pay dividends on fictitious stock or for their extravagance or waste; but the corporation is entitled only to a fair return on the actual value of its property devoted to the public use, after paying expenses and liabilities reasonably charged against the same, and what is a fair return must depend ultimately on the judgment of the court.

**11. SAME.**
　　The rates established by the commission of gas and electricity created by Laws 1905, p. 2092, c. 737, for gas and electricity furnished by a public service corporation, *held* not, under the facts, unreasonable.
　　Kellogg and Sewell, JJ., dissenting.

Appeal from Special Term.

Proceedings by the trustees of the village of Saratoga Springs to require the commission of gas and electricity to fix the price to be charged by the Saratoga Gas, Electric Light & Power Company for gas and electricity. From a determination of the commission fixing the maximum price, the company appeals. Affirmed.

The proceeding arose under chapter 737, p. 2092, of the Laws of 1905, creating the commission of gas and electricity and prescribing its powers and duties. Under section 15 of that act the trustees of the village of Saratoga Springs made complaint in writing that the price charged for gas and electric current by the defendant was excessive. Notice was given, pursuant to section 17 of the act, and after a hearing duly had the order was made from which this appeal was taken. Further facts appear in the opinion.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

Edgar T. Brackett (John B. Stanchfield, of counsel), for appellant.
Frank Gick (John L. Henning, of counsel), for respondent.

Briefs were submitted by the Attorney General and by the Public Service Commission for the Second District of the state.

SMITH, P. J. This commission has assumed to fix a maximum charge for gas and electricity within the village of Saratoga Springs. By this appeal their right so to do is challenged, upon the ground that such power is legislative, and cannot be delegated to a commission. The question raised is an important one, as it goes to the foundation of a policy which has been adopted by the state, and which, if such power be denied, is of little efficacy. That the power to fix a tariff of rates for a public service corporation is executive will not be contended. That such power as an original power is not judicial will be admitted. In Interstate Commerce Commission v. Railway Co., 167 U. S. 499, 17 Sup. Ct. 896, 42 L. Ed. 243, Justice Brewer, in writing for the court, says:

"The power to establish a tariff of rates for carriage and by a common carrier is a legislative, and not an administrative or judicial, function."

In C., B. & Q. R. R. Co. v. Jones, 149 Ill. 377, 37 N. E. 247, 24 L. R. A: 141, 41 Am. St. Rep. 278, it is said:

"The power to regulate and control the charges of railroad companies or other agencies engaged in public employments is legislative, and not judicial."

Further authority might be cited to the same effect. The pivotal contention here is as to whether this function is so purely legislative that it cannot in any degree be delegated to an administrative body, as a commission named as provided in this statute.

In determining this question, we are aided by well-considered au-

thority. In Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 Sup. Ct. 334, 29 L. R. A. 636, decided in 1886, the action was brought by the Farmers' Loan & Trust Company to enjoin the Railroad Commission of Mississippi from enforcing against the Mobile & Ohio Railroad Company the provisions of the statute of Mississippi entitled "An act to provide for the regulation of freight and passenger rates on railroads in this state, and to create a commission to supervise the same." It was claimed in that case that the act conferred both legislative and judicial powers on the commission, in violation of the Constitution of Mississippi. The Supreme Court of the United States reversed the decree of the Circuit Court, and remanded the cause, with instructions to dismiss the bill. In State of Minnesota v. Railway Co., 38 Minn. 281, 37 N. W. 782, the statute of the state had created a railroad and warehouse commission, with authority to determine reasonable and just rates for transportation of freight and passengers by the roads within the state. The respondent railroad company had refused to comply with the order of the commission as to the rate fixed. Proceedings were commenced to enforce obedience. The court held:

"The authority thus given to the commission to determine in the exercise of their discretion and judgment what are equal and reasonable rates is not a delegation of legislative power."

In discussing this objection, Mitchell, J., in writing for the court, says:

"The difference between the power to say what the law shall be, and the power to adopt rules and regulations, or to investigate and determine the facts in order to carry into effect a law already passed, is apparent. The true distinction is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and the conferring of an authority or discretion to be exercised under and in pursuance of the law."

After discussing the necessity of leaving the application of such a law to some administrative body, the opinion proceeds:

"The Legislature itself has passed upon the expediency of the law and what it shall be. The commission is intrusted with no authority or discretion upon these questions. It can neither make nor unmake a single provision of law. It is merely charged with the administration of the law and with no other power. Whether the charges of a railway in any particular case are or are not equal and reasonable is a fact left by the law for them to determine. If the commission find them unequal and unreasonable, and declare other rates to be equal and reasonable, the law itself declares the former unlawful, and allows the railway to charge only the latter."

The writ of mandamus asked for was awarded. This case was carried to the United States Supreme Court, and is there reported in 134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970. The case was there reversed, upon the ground that the Supreme Court of Minnesota had held that the statute precluded any judicial review of the determination of the commission. No question was made as to the validity of the delegation of such power, if the right of judicial review had not been taken away. Justice Miller, in writing a concurring opinion, stated two propositions of law:

"First. In regard to the business of common carriers limited to points within a single state, that state has the legislative power to establish the rates of

compensation for such carriage.    Second. The power which the Legislature
has to do this can be exercised through a commission, which it may authorize
to act in the matter, such as the one appointed by the Legislature of Minne-
sota by the act now under consideration."

Justice Bradley wrote a dissenting opinion in that case, in which
Justices Gray and Lamar concurred.    In that dissenting opinion he
said:

"I think it is perfectly clear, and well settled by the decisions of this court,
that the Legislature might have fixed the rates in question.    If it had done
so, it would have done it through the aid of committees appointed to investi-
gate the subject, to acquire information, to cite parties, to get all the facts be-
fore them, and, finally, to decide and report.    No one could have said that
this was not due process of law.    And if the Legislature itself could do this,
acting by its committees and proceeding according to the usual forms adopted
by such bodies, I can see no good reason why it might not delegate the duty to
a board of commissioners, charged, as the board in this case was, to regulate
and fix the charges so as to be equal and reasonable.    *    *    *    In the Rail-
road Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636,
we held that a board of commissioners is a proper tribunal for determining
the proper rates of fare and freight on the railroads of a state.    It seems to
me, therefore, that the law of Minnesota did not prescribe anything that was
not in accordance with due process of law in creating such a board and in-
vesting it with the powers in question."

In Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294,
decided in 1892, the court had under consideration provisions of an
act of Congress authorizing the President to suspend by proclama-
tion the free introduction of certain commodities when he became
satisfied that any country producing such articles imposed duties or
other exactions upon the agricultural or other products of the United
States which he may deem to be reciprocally unequal or unreason-
able.    In this case the Supreme Court held that Congress could not
under the Constitution delegate its legislative power to the President,
but that the provision referred to was not a delegation of legislative
power.    The principles there enunciated are in line with the reason-
ing of the cases before quoted.

In N. Y. & N. E. Ry. Co. v. Town of Bristol, 151 U. S. 556, 14
Sup. Ct. 437, 38 L. Ed. 269, the headnote in part reads:

"Railroad corporations are subject to such legislative control as may be
necessary to protect the public against danger, injustice, or oppression; and
this control may be exercised through a board of commissioners."

In that case the court had under review a statute of the state of
Connecticut relating to railway grade crossings.

In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup.
Ct. 1047, 38 L. Ed. 1014, decided in 1894, the court had under re-
view a statute of the state of Texas which created a railroad com-
mission with various powers, among others the right to regulate
rates and charges for transportation.    The Circuit Court restrained
the railroad commission from establishing any rates whatsoever un-
der and by virtue of the act.    The Supreme Court reversed the de-
cree in so far as it restrained the railroad commission from estab-
lishing rates and regulations, but sustained the decree as to certain
powers given by the act.    In referring to other provisions of the act,
Justice Brewer, in writing for the court, says:

"Applying this rule, the invalidity of these two provisions may be conceded without impairing the force of the rest of the act. The creation of a commission, with power to establish rules for the operation of railroads and to regulate rates, was the prime object of the Legislature. This is fully accomplished, whether any penalties are imposed for a violation of the rules prescribed, or whether the rates shall be conclusive or simply prima facie evidence of what is just and reasonable."

In Interstate Commerce Commission v. Cincinnati, etc., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243, decided in 1897, it was decided that the Interstate Commerce Commission was not authorized under the act, expressly or impliedly, to fix and establish rates. Justice Brewer writes this conclusion after an extended argument. The decision assumes that, if that power had been given, it would have been constitutional.

In San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, decided in 1899, the Legislature of California had authorized the board of aldermen, or other legislative body of any city or county, to fix the rates to be charged by water companies for the furnishing of water. This statute was held constitutional.

In C., M. & St. P. Ry. Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417, decided in 1900, the Legislature of South Dakota had provided for the appointment of a board of railroad commissioners and had authorized such board to make a schedule of reasonable maximum fare and charges for the transportation of passengers, freight, and cars on the railroads within the state. The railroad commission had made a schedule, and the bill was filed in the Circuit Court to restrain the enforcement of the schedule. The complaint made was that the rates were unjust and unreasonable. The Circuit Court dismissed the bill. This decree, however, was reversed by the United States Supreme Court, and the case remanded to a competent master, to report fully upon the facts. This direction would have been wholly unnecessary if the act had been unconstitutional, as is claimed by the appellants here.

In Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151, decided in 1902, the court had under consideration the act of the Legislature of the state of Minnesota creating a railroad and warehouse commission and authorizing that commission to fix rates. The action was brought to compel the plaintiff in error to comply with those rates. The decree was rendered as asked in the Supreme Court of Minnesota, and the decree of that court was affirmed by the United States court. In this case the constitutionality of the act was not discussed, but was assumed.

In Stanislaus County v. San Joaquin, etc., Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406, decided in 1904, a statute of California permitting boards of supervisors to fix water rates, was sustained. In Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, the act of Congress known as the "Tea Inspection Act" was under examination. That act authorized the Secretary of the Treasury to establish fixed and uniform standards of purity, quality, and fitness for consumption. The court held that the statute was not unconsti-

tutional, as vesting an executive officer with legislative power. Justice White, in writing for the court, said:

"We may say of the legislation in this case, as was said of legislation considered in Field v. Clark, that it does not in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessity of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted. * * * The claim that the statute commits to the arbitrary discretion of the Secretary of the Treasury the determination of what teas may be imported, and therefore in effect vests that official with legislative power, is without merit. We are of opinion that the statute, when properly construed, as said by the Circuit Court of Appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality. This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute."

In Atlantic Coast Line v. Florida, 203 U. S. 256, 27 Sup. Ct. 108, 51 L. Ed. 174, decided in 1906, a statute of Florida was held constitutional which created a board of railroad commissioners and provided that the rates for transportation as fixed by that board should be prima facie just and reasonable. The same rule was held in Seaboard Air Line Ry. v. Florida, 203 U. S. 261, 27 Sup. Ct. 109, 51 L. Ed. 175.

In Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, decided in 1907, the headnote in part reads:

"Congress, in enacting that navigation be freed from unreasonable obstructions arising from bridges which are of insufficient height or width or span, or are otherwise defective, may, without violating the constitutional prohibition against delegation of legislative or judicial power, impose upon an executive officer the duty of ascertaining what particular cases come within the prescribed rule."

The opinion states with approval the remarks of Chief Justice Marshall in Wayman v. Southard, 10 Wheat. 1, 6 L. Ed. 253, to the effect that although Congress could not delegate to the courts or to any other tribunals powers strictly and exclusively legislative, and although the line had not been exactly drawn that separates the important subjects which must be entirely regulated by the Legislature itself from those of less interest "in which a general provision may be made, and powers given to those who are to act under such general provisions to fill up the details," yet Congress may certainly delegate to others powers which the Legislature may rightly exercise itself, and "the maker of the law may commit something to the discretion of the other departments."

In Atlantic Coast Line R. R. Co. v. North Carolina Corporation Commission, 206 U. S. 1, 27 Sup. Ct. 585, 51 L. Ed. 933, decided in 1907, the statute of North Carolina created a corporation commission with power to fix rates. The plaintiff had questioned the power, which had been sustained by the Supreme Court of North Carolina. The Supreme Court of the United States affirmed the decision of the state court. Mr. Justice White, in writing for the court, says:

"The elementary proposition that railroads, from the public nature of the business by them carried on and the interest which the public have in their operation, are subject as to their state business to state regulation, which may be exerted either directly by the legislative authority, or by administrative bodies endowed with power to that end, is not and could not be successfully questioned, in view of the long line of authorities sustaining that doctrine."

In Chicago & N. W. Ry. Co. v. Railway Commissioners (C. C.) 35 Fed. 866, the court had under review an act of the state of Iowa authorizing railroad commissioners to fix maximum charge for transportation. The opinion was written by Mr. Justice Brewer. In part he says:

"Hence counsel conclude that the Legislature is the only body which can fix rates, and that it may not abdicate its functions and delegate this legislative power to another body. Of course, this question is pivotal; for, if the Legislature alone can fix rates, the railroad commissioners are exercising functions which do not belong to them, and, if the rates proposed infringe upon the property rights of the complainant, it may insist that such unauthorized action of the commissioners be stayed. * * * There is no inherent vice in such a delegation of power; nothing in the nature of things which would prevent the state, by constitutional enactment at least, from intrusting these powers to such a board; and nothing in such constitutional action which would invade any rights guaranteed by the federal Constitution."

It will be noticed that Justice Brewer, who wrote in this case, eight years later wrote the opinion in the Interstate Commerce Commission Case above cited, in which he assumes the constitutionality of such delegated power. Similar holdings are found in Tilley v. Savannah, Florida & Western R. R. Co. (C. C.) 5 Fed. 641, and New Memphis Gas & Light Co. v. City of Memphis (C. C.) 72 Fed. 952. In People v. Harper, 91 Ill. 357, the court states the first point urged that the authority granted to the railroad and warehouse commissioners by the state of Illinois to fix the rates for charges for the inspection of grain and compensation of officers is an unwarrantable delegation of legislative power. In that case the validity of the statute was upheld.

In C., B. & Q. R. R. Co. v. Jones, 149 Ill. 361, 37 N. E. 247, 24 L. R. A. 141, 41 Am. St. Rep. 278, a statute of the state of Illinois authorizing the board of railroad commissioners to fix rates, was upheld. The opinion in part reads:

"It has been held in a number of cases that statutes which create boards of commissioners and authorize them to make schedules of rates for railroad companies are not invalid for the reason here urged. The doctrine of these cases is that the functions of such boards are administrative rather than legislative, that the authority conferred upon them relates merely to the execution of the law, that a grant of legislative power to do a certain thing carries with it the power to use all proper and necessary means to accomplish the end, and that, as the reasonableness of rates changes with circumstances and Legislatures cannot be continuously in session, the requirement that the statute itself shall fix the charges might preclude the Legislature from the use of the agencies necessary to perform the duty imposed upon it by the Constitution; in short, that the Legislature may authorize to do things which it might properly, but cannot conveniently or advantageously do itself."

In State of Minnesota v. Great Northern Ry. Co., 100 Minn. 445, 111 N. W. 289, the statute of Minnesota authorizing the railway commission to determine whether a railway corporation may increase its stock was under consideration. That part of the statute was held to

be unconstitutional, because the matter was left entirely to the discretion of the railway commission, without any standard by which they should be guided, and it was thus held to be a delegation of legislative power.  The headnote in part reads:

"In the exercise of this right the Legislature may enact a statute providing generally for what purposes and upon what terms, conditions, and limitations an increase of capital stock may be made, and confer upon the commission the duty of supervising any proposed increase.  It may also delegate to the commission the duty of finding the facts in each particular case, and authorize and require it, if it finds the existence of facts that bring the case within the statute, and allow the proposed increase; otherwise, to refuse it."

In the opinion we find:

"The rule was reaffirmed in the case of State ex rel. v. Railway Co., 38 Minn. 281, 37 N. W. 782.  The statute considered in that case (section 8, c. 10, p. 53, Gen. Laws 1887), which authorized the Railroad and Warehouse Commission to find and determine whether the tariffs of rates, fares, charges, or transportation, or any part thereof, filed or published by any common carrier, were equal and reasonable, and, if they were not, to compel the carrier to make them so.  The question whether this statute delegated legislative power to the commission was raised, and this court held that there was no attempt to delegate to the commission the power to determine what the law should be, and that in this respect the statute was constitutional."

After quoting from the opinion of Justice Mitchell in that case, the opinion proceeds:

"The court then proceeded to apply the test indicated to the statute then under consideration, and held that it did not attempt to delegate legislative powers to the commission, or to invest it with any discretion as to what the laws should be, but simply charged it with the administration of the statute, which became a complete law upon its enactment; or, in other words, the Legislature by the statute declared that all freight and passenger rates should be equal and reasonable, and merely imposed upon the commission the administrative duty of determining whether the charges of a carrier in any particular case were or were not unequal or unreasonable—that is, to determine whether it was or was not obeying the law, and, if not, to compel its obedience by enforcing rates which the facts found might show to be reasonable."

The same rule has been held in State of Nebraska v. Fremont, Elkhorn & Missouri Valley Railroad Company, 22 Neb. 313, 35 N. W. 118; in Georgia Railroad v. Smith et al., Railroad Commissioners, 70 Ga. 694; in McWhorter et al., as Railroad Commissioners of Florida, v. Pensacola & Atlantic Railroad Co., 24 Fla. 417, 5 South. 129, 2 L. R. A. 504, 12 Am. St. Rep. 220; in Stone v. Y. & M. V. R. R. Co., 62 Miss. 607, 52 Am. Rep. 193; in Atlantic Express Co. v. Wilmington & Weldon R. R. Co., 111 N. C. 463, 16 S. E. 393, 18 L. R. A. 393, 32 Am. St. Rep. 805.  In the brief presented by the Public Service Commission is also found a quotation from the opinion given by Attorney General Moody to Congress, in which he reaches two conclusions:

"(1) There is a governmental power to fix the maximum future charges of carriers by railroads vested in the Legislatures of the states with regard to transportation exclusively within the states, and vested in Congress with regard to all other transportation.

"(2) Although legislative power, properly speaking, cannot be delegated, the lawmaking body, having enacted into the statute the standard of charges which shall control, may intrust to an administrative body, not exercising in the true sense judicial power, the duty to fix rates in conformity with that standard."

In the same brief 22 states are named which have similar statutes.

In the courts of this state this question has not been directly decided; but the principle is, I think, established in analogous cases. See Matter of N. Y. Elevated R. R. Co., 70 N. Y. 327; Matter of Gilbert Elevated Ry. Co., 70 N. Y. 361; People ex rel. Steward v. Commissioners, 160 N. Y. 202, 54 N. E. 697; People v. Long Island R. R. Co., 134 N. Y. 506, 31 N. E. 873.

It will thus be seen that the assumption of this power by the commission is justified by convincing authority. Not a decision is cited in the state or federal courts which questions the power, provided the determination of the commissioners is directed by some standard which is presented in the statute.

It is strongly insisted that the statute fixes no such standard. If in this the appellant be correct, the authorities cited are claimed to establish the unconstitutionality of the act. The power of the commission is given in these words:

"After such hearing and upon investigation as may have been made by the commission, or its officers, agents or inspectors, the commission within the limits prescribed by law may fix the maximum price of gas or electricity, which shall be charged by such corporation or person in such municipality. * * *"

The commissioners are not required in explicit terms to fix a reasonable rate, nor a just rate, nor an equal rate. They are given no standard as a percentage of profits, by which they are to fix the rate. Their only guide is to fix the rate "within the limits prescribed by law." The law is settled by repeated adjudication that the Legislature itself cannot fix a rate which would be confiscatory of the property of the corporation. The law is equally well settled that a public service corporation has not the right of a purely private corporation to charge what it will for its product, but must serve the public at just and reasonable rates. In Brooklyn Union Gas Co. v. State of New York, 115 App. Div. 70, 100 N. Y. Supp. 625, Judge Gaynor, in writing for the Appellate Division of the Second Department, says:

"The rule is that public service corporations may charge only a reasonable rate and the courts may ascertain such rate in a given case."

See, also, Killmer v. N. Y. C. R. Co., 100 N. Y. 395, 3 N. E. 293, 53 Am. Rep. 194.

The determination of this commission is made subject to review by the Appellate Division, which must be guided in its review by what shall upon the evidence appear to be a reasonable rate, which the public have the right to demand, and which shall not be so low as to render valueless the property of the corporation. With the law thus established and the rule defined under which their decisions must be tested upon an appeal, the words "within the limits prescribed by law" can have only one significance. The standard which is to guide this commission in the exercise of its administrative duties in fixing rates. is a reasonable charge for the product of the public service corporation—one reasonable to the public and reasonable to the corporation. Such a standard is sufficiently defined, within the authorities which have been referred to.

But it is insisted by appellant that, without these words in the statute, the commission would be required to fix the rates within the limits required by law, and that such words, therefore, add nothing to the statute and fix no standard which the commission would not otherwise have. The rate, when fixed by the Legislature, cannot be reduced by the court as in excess of reasonable charges. Brooklyn Gas Co. v. City, 188 N. Y. 334, 81 N. E. 141. Without these words of limitation, the act might be deemed to give to the commission the power possessed by the Legislature. A complete answer, however, is that it cannot matter whether the standard by which the commission is to be guided be fixed by common law or by the statute. In either case no legislative discretion is delegated to the commission. Without such discretion, their functions will be held administrative, and not legislative.

The appellant makes further criticism of this statute upon the ground that the commission is authorized to receive ex parte and hearsay evidence and to base its decision thereupon, and that the court review provided is only from a determination so made. But this procedure the Legislature could adopt. Such legislative power as is delegated to boards of supervisors may be so exercised. In proceedings for equalization of taxes by the State Board of Assessors, evidence which would not be admissible in a court of law is admissible upon which they may base their determination. It will not be questioned that the appellant's property can only be taken by due process of law. To make effectual this constitutional protection the appellant must have the right to appeal to the court whenever it is claimed that its constitutional rights are invaded. By the statute itself an appeal is given to the Appellate Division of the Supreme Court from the determination of this commission. That appeal must be heard upon the record, and the determination upon that appeal must be upon what, after full disclosure by the service corporation, is shown by fair proof to be the rate which ought reasonably to be charged. It is contended that this right of appeal does not give to appellant the protection guaranteed by the Constitution, as this review must be of a determination made partly upon hearsay evidence. Granting, for the argument, that the right of appeal given by this statute is not adequate to preserve to the corporation its constitutional protection, in that case it must be held that the right of appeal is not an exclusive remedy, but that concurrent therewith there is at all times the right of the corporation to proceed by affirmative action to enjoin the enforcement of the commission's order. In such an action the rights of the corporation can be certainly safeguarded. Our duty has been many times declared to so construe a statute, if possible, as to conform to constitutional requirement, and to disregard such parts of a statute as are in violation thereof, where the statute is separable and a substantial part thereof was lawfully enacted.

Again, the act requires that the price thus fixed by the commission "shall be the maximum price to be charged by such person or corporation for gas or electricity in such municipality for a term of three years," and thereafter until, upon complaint, the commission shall fix a new price. It is insisted that this refuses to the corporation the

equal protection of the law, and makes a rate which·may within that three years become confiscatory by reason of an increase in price of materials used in 'making gas and electricity. But to this it may be answered that if such prices were fixed by the Legislature itself it must remain a maximum price until the Legislature should again meet, unless modified by the court, at which time an application might be made for a modification thereof. So here the corporation may apply to the Legislature at any time for relief. Moreover, the affirmance by the court of the rate fixed by the commission is simply an affirmance of the reasonableness of that rate at the time of the determination. If at any time thereafter facts should arise which would make such rates confiscatory, the courts are always open to relieve the service corporation or person from the restriction of those rates. It would have been better if the act had provided for a remedy by the commission itself upon an application by the service corporation, in case of a change in condition; but, as it is, the provision that the rate fixed shall continue for three years is harmless to deprive the corporation of its right of property, because of the right still left in the corporation to apply either to the Legislature or to the court for relief.

It is unnecessary here to consider the criticism of the act as to the original power given to the court on appeal. That question will become material only when the court assumes to exercise some such power; nor is it necessary to consider, the criticism as to the unreasonableness of the penalty whereby, for an overcharge, the just claim for compensation is forfeited. If invalid, it does not affect those provisions of the act which govern the determination of the order here appealed from. After considering all of the objections urged, our conclusion is that the challenge to the·constitutionality of the act should not be sustained, and there remains only to consider whether the determination of the commissioners has been unreasonable and unjust.

In determining this question we are fully instructed as to the rule which is to govern us. That the presumption is in favor of the order appealed from is held in Chicago Ry. Co. v. Tompkins, 176 U. S. 173, 20 Sup. Ct. 336, 44 L. Ed. 417, and Milwaukee E. & L. Co. v. City of Milwaukee (C. C.) 87 Fed. 577. In San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154, it is said that:

"Judicial 'interference should never occur, unless the case presents clearly and beyond all doubt such a flagrant attack upon the rights of property under the guise of regulations as to compel the court to say that the rates prescribed will necessarily have the effect to deny just compensation for private property taken for public use."

In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 363, 14 Sup. Ct. 1059, 38 L. Ed. 1014, it is said:

"It is unnecessary to decide, and we do not wish to be understood as laying down an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable."

In Covington Turnpike Co. v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560, it is said:

"The public cannot properly be subjected to unreasonable rates in order that the stockholders may earn dividends."

In San Diego Loan & Trust Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892, it is said:

"It no longer is open to dispute that under the Constitution what the company is entitled to demand in order that it may have just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public."

In Smyth v. Ames, 169 U. S. 543, 18 Sup. Ct. 434, 42 L. Ed. 819, the opinion reads:

"We hold, however, that the basis of all calculation as to reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public; and in order to ascertain that value the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stocks, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by the statute, and the sum required to meet operating expenses, are all matters for consideration and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is the fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

In Cotting v. Kansas City Stockyards Co., 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, in discussing the decisions of the Supreme Court in regard to the reasonableness of rates, it is said:

"It is declared that the present value of the property is the basis by which the test of reasonableness is to be determined, although the actual cost is to be considered, and that the value of the services rendered to each individual is also to be considered."

In Brymer v. Butler Water Co., 179 Pa. 231, 36 Atl. 249, 36 L. R. A. 260, the court held:

"A system of water rates that yields no more income than is fairly required to maintain the plant, pay fixed charges and operating expenses, and provide a suitable sinking fund for the payment of debts and pay a fair profit to the owners of the property is not unreasonable, so that the rates can be reduced by the court. * * * Ordinarily that is a reasonable charge or system of charges which yields a fair return upon the investment. Fixed charges and the costs of maintenance and operation must first be provided for. Then the interests of the owners of the property are to be considered. They are entitled to a rate of return, if their property will earn it, not less than the legal rate of interest."

It thus appears that the stockholders of a public service corporation are not entitled to require the public to pay dividends upon fictitious stock or for their extravagance or waste. Such a corporation, however, is entitled to a fair return upon the actual value of its property that it is devoting to the public use, after paying all expenses and liabilities reasonably charged against the same. What is deemed a fair return must depend ultimately upon the judgment of the court. In 1886 the committee of the Senate of the state recommended for

a gas company in New York a return not exceeding 10 per cent. upon its investment. The New York Mutual Gas & Light Company by its charter is permitted to earn dividends to the extent of 10 per cent. The Senate committee of 1905 assumed a return of 8 per cent. as proper, and the gas commission in 1906 found that 8 per cent. was a reasonable return upon the actual value of complainant's property used in gas manufacture. The railroad law of the state (Laws 1890, p. 1096, c. 565, § 38) permits the Legislature to reduce the rate of freight or fare; but the same shall not without the consent of the corporation be so reduced as to produce less than 10 per cent. per annum on the capital actually expended. An investor may loan his money upon sure security, and is allowed by law to charge 6 per cent. for the loan. The investment in a gas and electric light company, however, is not secured, as is a loan, upon abundant security. There is in it a greater risk of loss, and upon all economic principles the investment should for that reason be entitled to a greater rate of return than an investment loan upon approved security. If the court should allow to these investors only the same or a less return than is obtained for a loan upon approved security, no capital would henceforth be advanced for these enterprises, and the public would either be deprived of their advantages or the municipality would be compelled to build for itself. Both upon principle and necessity, then, a fair return upon the value of the property actually used is such a return as shall be fair compensation for the risk assumed by the investor in permitting his money to remain in such an enterprise. The public cannot fairly question this application of the rule, and must pay such rates as will ordinarily yield such return to the stockholders of the public service corporation. The court is charged, not only with the duty of protecting the public interest, but also with a duty no less solemn of protecting the property rights of those whose moneys are invested in public service corporations.

Applying these rules to the case at bar, this appellant has not made clear to us that the rate fixed will not yield to its stockholders a fair return upon the value of its property. Evidence has been adduced of the value of its property, of the amount of output of gas and electric current, of the cost of its production, of the receipts in gross from each source. One more factor is needed, however, for the problem—the loss of income which the reduced maximum rate will cause. This factor is not found in appellant's brief, and after a careful review of the evidence I have been unable to find any figures from which this factor can be fully deduced. If the rate of gas were uniform, at $2 or $1.75 per 1,000 cubic feet, and the price be reduced to $1.45 per 1,000, we could at once ascertain to what extent the new rate would reduce the income. But the rate is not uniform. The superintendent swears that the rate charged was all the way from $2 to 95 cents. The reduction made by the commission would simply cause loss upon the output of gas which has heretofore been sold for a price exceeding $1.45 per 1,000.

In the report of the appellant to the gas commission for the year ending June 30, 1906, we find that only a little more than 18,000,000 cubic feet of gas was being sold for $2, or a net price of $1.75, so

that the diminution of income caused by the reduced rate of gas would be less than $6,000. As to the reduced income in the sale of electric current caused by the rates fixed, we are left wholly in the dark. The maximum charge has been 12 cents per kilowatt hour. If the price were uniform, a reduction of the price to 8 cents would mean a definite loss of income, which would be easily ascertainable. The average price received for the sale of electric current, as sworn to by appellant's expert, was $5^{42}/_{100}$ cents per kilowatt hour—$2^{58}/_{100}$ cents below the maximum fixed by the commission. The record contains no evidence from which can be ascertained how much of that output has been selling for a price to exceed 8 cents, or how much, therefore, will be the loss of income in conforming to the commission's rates. The only loss, then, established, which would be caused by adopting the commission's rates, and of which this court can take cognizance, is this loss of less than $6,000. The commission might properly estimate that this loss would be substantially reduced by new customers which the reduced rate would naturally bring. But, aside from this consideration, we are satisfied that with prudent management the company may still return to the stockholders a reasonable percentage upon the value of this property, even under the reduced income. It will hardly be profitable in this opinion to discuss each item of valuation of the appellant's properties and of cost of production. The valuations of appellant's expert are based upon the cost of reproduction, with no allowance for depreciation, except in one or two minor items, and yet he charges to the expense account a large contingent liability, not only for current repairs, but for final replacement. Again, it appears that gas is being sold to some parties for less than the cost of the manufacture. To one customer electric current is furnished for 1½ cents a kilowatt hour, and a substantial amount of electric current is sold for less than cost. It is not apparent why some customers should be charged an exorbitant rate to compensate for loss suffered in the sale to others. After an examination of the record presented, aided by exhaustive and able briefs of counsel, we are not convinced that the rates established by the order appealed from are either unjust or unreasonable to this appellant. The order should, therefore, be affirmed.

Order affirmed, with costs.

CHESTER and COCHRANE, JJ., concur.

JOHN M. KELLOGG, J. (dissenting). The Legislature has the power to prescribe a reasonable rate at which an individual or corporation engaged in a public service business shall serve the public. Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858; People v. Budd, 117 N. Y. 1, 22 N. E. 670, 682, 5 L. R. A. 559, 15 Am. St. Rep. 460; Budd v. New York, 143 U. S. 468, 12 Sup. Ct. 468, 36 L. Ed. 247.

"If unhampered by contract, there is no doubt of the power of the state to provide by legislation for maximum rates of charges for railroad companies, subject to the condition that they must be such as will admit of the carrier earning a compensation that under all the circumstances shall be just to it

and to the public, and whether they are or not is a judicial question. If the rates are fixed at an insufficient amount, within the meaning of that term as given by the courts, the law would be invalid, as amounting to the taking of the property of the company without due process of law." Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 687, 19 Sup. Ct. 566, 43 L. Ed. 858.

We must know the source of such power, in order to understand its extent and limitations, and in order to determine whether the legislation in question is within or beyond the legislative right. This power does not come from the character of the person performing the service, but from the nature of the service performed. A corporation is a person within the constitutional provisions guaranteeing the property rights and equal protection of the law to all persons. Id., 173 U. S. 690, 19 Sup. Ct. 565, 43 L. Ed. 858.

The Legislature, therefore, cannot prescribe a rate for corporations which is not prescribed for individuals in the same class of business. The statute in question applies in terms to corporations and individuals alike.

"The power of regulation in these cases does not turn upon the fact that the entities affected by the legislation are corporations deriving their existence from the state, but upon the fact that the corporations are common carriers, and therefore subject to legislative control. The state, in constituting a corporation, may prescribe or limit its powers and reserve such control as it sees fit, and the body accepting the charter takes it subject to such limitations and reservations, and is bound by them. The considerations upon which a corporation holds its franchise are the duties and obligations imposed by the act of incorporation. But, when a corporation is created, it has the same rights and the same duties, within the scope marked out for its action, that a natural person has. Its property is secured to it by the same constitutional guaranties, and in the management of its property and business is subject to regulation by the Legislature to the same extent only as natural persons, except as the power may be extended by its charter. The mere fact of a corporate character does not extend the power of legislative regulation. For illustration, it could not justly be contended that the act of 1888 would be a valid exercise of legislative power as to corporations organized for the purpose of elevating grain, although invalid as to private persons conducting the same business." People v. Budd, 117 N. Y. 21, 22 N. E. 677, 5 L. R. A. 559, 15 Am. St. Rep. 460. "The attempts made to place the right of public regulation in these cases upon the ground of special privilege conferred by the public on those affected cannot, we think, be supported. The underlying principle is that business of certain kinds holds such a peculiar relation to the public interests that there is superinduced upon it the right of public regulation." Id., 117 N. Y. 27, 22 N. E. 679, 5 L. R. A. 559, 15 Am. St. Rep. 460.

"The power to enact legislation of this character cannot be founded upon the mere fact that the thing affected is a corporation, even though the Legislature has power to alter, amend, or repeal the charter thereof. The power to alter or amend does not extend to the taking of the property of the corporation either by confiscation or indirectly by other means. The authority to legislate in regard to rates comes from the power to prevent extortion or unreasonable charges or exactions by common carriers or others exercising a calling and using their property in a manner in which the public have an interest." Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 698, 19 Sup. Ct. 571, 43 L. Ed. 858.

All the authorities referring to the subject rest this power of regulation solely upon the police power of the state, which is the right to legislate concerning the public welfare, the public safety, and the

public health. The constitutionality of this act depends upon the question whether it is a valid exercise of the police power.

"To justify the state in interposing its authority in behalf of the public, it should appear, first, that the interest of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for interference with the parties, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations." Colon v. Lisk, 153 N. Y. 188, 47 N. E. 302, 60 Am. St. Rep. 609; Lawton v. Steele, 152 U. S. 133, 137, 14 Sup. Ct. 499, 38 L. Ed. 385.

"The legislative determination as to what is a proper exercise of the police power is subject to the supervision of the court, and in determining the validity of an act it is its duty to consider, not only what has been done under the law in a particular instance, but what may be done under and by virtue of its authority. Liberty, in its broad sense, means the right, not only of freedom from servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation." Fisher Co. v. Woods, 187 N. Y. 90, at pages 94, 95, 79 N. E. 836, at page 837.

"It cannot be reiterated too often that the police power must be exercised within its proper sphere and by appropriate methods. Whenever a statute arbitrarily strikes down private rights, invades personal freedom, or confiscates or destroys private property, it is repugnant to the Constitution, and should not be permitted to stand no matter how laudable its purpose or beneficial its effect." Wright v. Hart, 182 N. Y. 330, at page 344, 75 N. E. 404, at page 409, 2 L. R. A. (N. S.) 338.

"In every case that comes before this court, therefore, where legislation of this character is concerned, and where the protection of the federal Constitution is sought, the question necessarily arises: 'Is this a fair, reasonable, and appropriate exercise of the police power of the state, or is it an unreasonable, unnecessary, and arbitrary interference with the right of the individual to his personal liberty, or to enter into those contracts in relation to labor which might seem to him appropriate or necessary for the support of himself and family?' Of course, the liberty of contract relating to labor includes both parties to it. One has as much right to purchase as the other to sell." Lochner v. New York, 198 U. S. 45, 56, 25 Sup. Ct. 539, 543, 49 L. Ed. 937.

"The provisions of the state and federal Constitutions protect every citizen in the right to pursue any lawful employment in a lawful manner. He enjoys the utmost freedom to follow his chosen pursuit, and any arbitrary distinction against or deprivation of that freedom by the Legislature is an invasion of the constitutional guaranty." People v. Williams, 189 N. Y. 131, 134, 81 N. E. 778, 779.

"In a broad sense, whatever prevents a man from following a useful calling is an invasion of his liberty, and whatever prevents him from freely using his lands or chattels is a deprivation of his property." People v. Haynor, 149 N. Y. 195, 199, 43 N. E. 541, 542, 31 L. R. A. 689, 52 Am. St. Rep. 707.

The Legislature cannot declare it a misdemeanor for a real estate agent to sell land in first and second class cities without written authority (Fisher Co. Case, above); nor declare fraudulent, as to creditors, a sale of merchandise in bulk unless certain conditions are complied with (Wright Case, supra); nor prohibit an employer from requiring that his employés shall not join a labor union (People v. Marcus, 185 N. Y. 257, 77 N. E. 1073); nor prescribe the hours which a baker shall be employed (Lochner Case, supra); nor provide that a woman shall not work in a factory between 9 p. m. and 6 a. m. (Williams Case, supra); nor require railroad companies to issue mileage books (Lake Shore, etc., Railway Co. v. Smith, supra).

The above authorities, and the cases referred to by them, show that

the Legislature has no power to determine at what price a merchant shall sell his dry goods or groceries, upon what terms a farmer shall sell his horse or farm produce, nor how long a laborer shall work, or what he shall receive for his work.

Gas and electricity are the commodities which the defendant sells, the products of its labor and its property, and the constitutional rights above referred to surround it and protect its property and business in the same way that the property and business of an individual are protected. It is just as much for the public welfare, the public safety, and the public health to have cheap bread, milk, groceries, and clothing as cheap gas, electricity, and railroad fares. By what right, then, may the Legislature regulate the price of the latter, and be powerless to interfere with that of the former? The answer to this question is so easy and is so well understood that it is usually overlooked, and lawyers and judges have sought for more remote and complicated reasons, which are alike unconvincing and irrelevant. The reasons usually assigned are the power to regulate corporations, supposed grants and benefits received from the public, the right to regulate monopolies, and a dedication of the property to the public; i. e., an unnatural partnership, by which one partner is to furnish the capital and the labor and the other partners direct him how to carry on his business and take his product at a price fixed by them. If these reasons, or any of them, are valid, it would naturally follow, as many of the earlier cases suggested, without deciding, that the only remedy against oppressive regulation is an appeal to the Legislature or an abandonment of the business.

If the party engaging in such service has agreed in advance that the Legislature may regulate the manner in which his business shall be conducted and fix the price of his product, he is not in a position to complain of unreasonable legislation in those respects. In Purdy v. Erie Railroad Co., 162 N. Y. 43, 56 N. E. 508, 48 L. R. A. 669, it was held that the mileage book law, which had been declared unconstitutional as to existing railroads, was valid as to companies beginning their business after the passage of the law; Judge Cullen saying, at page 49 of 162 N. Y., page 510 of 56 N. E. (48 L. R. A. 669):

"Therefore a regulation as to the price of transportation, which would be an illegal exaction when sought to be imposed on existing corporations solely by legislative fiat, may, in the case of future corporations, be the mere performance of the obligation of a contract."

Mr. Justice Brewer, in Cotting v. Kansas City Stockyards, 183 U. S. 79, 91, 22 Sup. Ct. 30, 35, 46 L. Ed. 92, says:

"There has been no further ruling than that the state may prescribe and enforce reasonable charges."

"From the earliest period of the common law it has been held that common carriers were bound to carry for a reasonable compensation. They were not at liberty to charge whatever sum they pleased, and, even where the price of carriage was fixed by the contract or convention of the parties, the contract was not enforceable beyond the point of reasonable compensation. From time to time statutes have been enacted, in England and in this country, fixing the sum which should be charged by carriers for the transportation of passengers and property, and the validity of such legislation has not been questioned.

But the business of common carriers, until recent times, was conducted almost exclusively by individuals for private emolument, and was open to every one who chose to engage in it. The state conferred no franchise and extended to common carriers no benefit or protection, except that general protection which the law affords to all persons and property within its jurisdiction." People v. Budd, 117 N. Y. 19, 22 N. E. 676, 5 L. R. A. 559, 15 Am. St. Rep. 460.

And at page 20, 117 N. Y., and page 677, 22 N. E. (5 L. R. A. 559, 15 Am. St. Rep. 460):

"The principle of the common law that common carriers must serve the public for a reasonable compensation became a part of the law of this state, and from the adoption of the Constitution has been a part of our municipal law."

Before the day of railroads private individuals operated stage coaches and performed the duties of common carriers. The common law determined that the calling was affected with a public interest, and charged upon it the duty of furnishing to all the public alike a reasonable service at a reasonable price. Of course, the operators used the public roads. So did every one, and in every business. If the stage driver owned the right of way upon which he traveled, he was still a common carrier and was charged with the duties pertaining to that calling.

The following situation illustrates that the duty arises from the nature of the calling, and not otherwise. A man owns a large tract of land, with a manufacturing plant in the center. A railroad runs across each end of it; he having conceded the right of way. Upon a private right of way he runs stage coaches and a trolley line for hire between the railroad stations. He also builds a road connecting those points, and along the road he builds houses and rents them to his employés and others, and a village thus grows up; he owning all the land and all the houses. His plant is furnished with an electric light system, from which he sells electricity to the villagers; but the wires extend along the private right of way and do not approach or cross the road. He operates the meat market, the milk route, supplies ice, and a general store. The reasons usually assigned, above stated, as the basis for a legislative regulation of prices are all found wanting here. But in running stages and trolley cars for a fare, and selling electricity, he enters upon a calling which the common law has regulated, and he cannot control the price. In the other matters the price is subject to the agreement of the parties, and he may refuse to sell except at his own price.

Supplying the public with gas and electricity for a price (People ex rel. Woodhaven Gas Co. v. Deehan, 153 N. Y. 528, 533, 47 N. E. 787), and operating public elevators for profit, and certain other callings, have been determined to be so affected with a public interest that they are charged with the common-law rule, applicable to common carriers, that the service must be reasonable to all alike and at a reasonable price, and those engaging in such calling are charged with that duty, and are deemed in advance to agree to such conditions.

The fact that the person rendering the service has the right to make reasonable regulations with reference to his business resulted in the public permitting him to fix the rate. This often led to exorbitant

charges and extortion, and called with a loud voice for a remedy. While the person performing the service had the legal right to receive a reasonable rate, he had not the right arbitrarily to fix that rate. Having agreed to render the service at a quantum meruit, it is repugnant to the law governing such transactions that one party may arbitrarily and conclusively fix the price. It is therefore reasonable for the Legislature, in the exercise of its police power, to reverse the situation and name a reasonable price. But it is as clearly illogical and unfair that the public shall fix a final and conclusive price as it would be to permit the person furnishing the service so to do. A reasonable price fixed by either party invades no right. An unreasonable price fixed by either party is illegal at common law. Before any statute was passed regulating the rate to be charged, every patron of such a service, and the party furnishing it, had the common-law right at any time to bring the other into a court of justice and have the reasonableness of the rate adjudicated. The common law imposes the duty of a reasonable rate. No other could be exacted. But the law did not execute itself, and it is necessary and proper for the Legislature to require an observance of the common-law contract price. In other words, no new regulation infringing upon property rights is necessary or proper; but a regulation is necessary and proper to administer and carry into effect the common-law rate. Strictly speaking, it is a mistake to say that the Legislature, or a commission created by it, may in any case fix the rate. The common law fixes the rate. The Legislature or the act of the commission is simply an enforcement of the common-law rate.

"In fact, the common-law rule, which requires the charge to be reasonable, is itself a regulation as to price. Without it the owner could make his rate at will, and compel the public to yield to his terms, or forego the use." Munn v. Illinois, 94 U. S. 113, 134, 24 L. Ed. 77.

"To limit the rate of charges for services rendered in a public employment or a use of property in which the public has an interest was only changing regulation which existed before, and established no new principle in the law, but only giving new effect to an old one." Budd v. New York, 143 U. S. 517, 538, 12 Sup. Ct. 468, 474, 36 L. Ed. 247.

In speaking of the common-law duty to furnish service at a reasonable price, Mr. Justice Brewer, in Cotting v. Kansas City Stockyards, etc., supra, at page 97 of 183 U. S., page 38 of 22 Sup. Ct. (46 L. Ed. 92), says:

"The authority of the Legislature to interfere by a regulation of rates is not an authority which destroyed the principles of these decisions, but simply to enforce them, though its prescription of rates is prima facie evidence of their reasonableness."

Prima facie the maximum rate as fixed by the Legislature is reasonable. Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858.

It is manifest that while the reasoning of the cases as to the basis of the rule are not at all times harmonious or satisfactory, the result of all is that the price must be reasonable; that is, the common-law price. Therefore it follows that this common-law duty and right is the real source of the power to regulate rates. At the time the statute in question was passed the defendant was engaged in a business the na-

ture of which charged it with the duty, and gave it the property right, of furnishing gas and electricity at a reasonable price, and gave it the right to have the reasonableness of the price determined by the adjudication of the courts in case it was controverted. Any legislation which imposes an unreasonable price upon it, or deprives it of its right to have the reasonableness of the price determined by a court of justice, deprives it of its property without due process of law, and denies it the equal protection of the law. The law is forcibly and concisely stated in 8 Cyc. p. 1067:

"The Legislature, itself or through a railroad commissioner, etc., prescribes the rates. The courts decide whether it is so unjust and unreasonable as to conflict with the constitutional guaranties. The Legislature cannot say finally that a rate is just and reasonable; nor can the court revise or change the rates, or say what would be a reasonable and just rate."

We must not be misled by the use of the term "maximum rates" in this class of legislation. There can be but one reasonable price for the same article at the same time in the same place. A reasonable price cannot be so unreasonable that another and different reasonable price can take its place at the caprice of one of the contracting parties. As the contract between the producer and the public is that he shall have a reasonable price for such service as is required of him, and the Legislature has fixed the price, it is presumed that the price so fixed is a reasonable price, which does not admit of another so-called reasonable price. Brooklyn Union G. Co. v. City of New York, 188 N. Y. 334, 81 N. E. 141. A proper construction of the words "maximum rate" is that it is the reasonable rate, with permission to the party furnishing the service to do business at an inadequate profit, or at a loss, if he desires. A person has the legal right to furnish such service at less than its reasonable value, or even to give it away; and so long as reasonable service is furnished, and all are treated alike, he is within his constitutional rights, unless his creditors or the lunacy authorities interfere. An attempt to fix a maximum price so large that under the most unfavorable conditions it will produce a reasonable price to the producer would clearly be an unreasonable price under the most favorable conditions, or under ordinary conditions.

It is not conceivable that in a great state like this the Legislature can prescribe a uniform price for supplying gas and electricity in every locality. The various climatic conditions, the distances of the various plants from the supply of coal and oil and from the factories producing its appliances and machinery, and the amount of service required, the price of labor, and the various other conditions which readily occur to the mind, show clearly that a reasonable price in some large cities might be a very unreasonable price in some small villages. It would seem that a statute declaring a uniform rate throughout the state, applicable to every locality and every plant, would upon its face be unreasonable. These conditions render it not only reasonable, but almost a necessity, if any regulation as to price is to be made by the public, that each locality shall be treated by itself, and an administrative commission, which may visit the various localities, take evidence, make investigations in various ways, and ascertain the exact

situation in each locality, is a most just and effective means of determining in the first instance what price shall be charged in a particular place.

The legality of such commissions has been sustained by the courts of many of the states and by the Supreme Court of the United States. Changing conditions from time to time determine what is a reasonable rate, and an order of an administrative commission can better enforce such rate than an act of the Legislature. Such legislation is a reasonable exercise of the police power. Legislation gives the power to the commission; but its duties are administrative only, viz., to compel an observance of the existing laws. It is the proper function of the Legislature, and of the Legislature alone, to impose upon property and persons duties not already existing. If the common-law rule that parties engaged in this service must serve all alike, and give a reasonable service at a reasonable price, does not apply to parties engaged in a service of this kind, and is not the foundation of this class of legislation, then the regulation of rates as to such service is a legislative act, and the duty imposed springs from legislation alone; and it is difficult to understand how the Legislature may delegate its functions and allow some other body to impose a new duty upon persons and property. If the power to regulate arises only from an understanding that the person will carry on his business subject to legislative control, this means that he is willing to take the judgment and discretion of the Legislature on each particular subject in which he is sought to be controlled. The legislative judgment and discretion which he contracted for does not allow the Legislature to impose upon him the judgment and discretion of an unknown commission. The act of the commission in fixing the rates is legislative, if in the absence of such act no legal limit as to rate existed. It is administrative, if there was a legal regulation of the rates, and the commission is simply to name and enforce the common-law rate. The common-law duties, as stated, furnish a broad and secure foundation upon which may rest all legislation necessary and proper to protect the public interests. In the absence of such duties, the right in each case is problematical, and the act of such commissions of doubtful validity.

Like every administrative board or executive officer, the commission must know the facts upon which it is to act, and it may grant hearings, take testimony, and do various acts which naturally pertain to a court of justice; but it is not thereby made a court of justice. Its acts are still administrative, and not judicial. People ex rel. Lodes v. Dept. of Health, 189 N. Y. 185, 190, 82 N. E. 187. The Legislature may, through its various committees, grant hearings, determine facts, and make regulations based upon its conclusion therefrom. It does not thereby become a court, nor its acts judicial. The hearing is one step in acquiring the necessary information upon which the commission may in part base its administrative order. In Chicago, etc., Railway Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 702, 33 L. Ed. 970, the Minnesota statute sought to make the order of such a commission a final decision of the rights of the parties; but the court

held it an unreasonable exercise of the police power, saying at page 457 of 134 U. S., page 466 of 10 Sup. Ct. (33 L. Ed. 970):

"It deprives the company of its right to a judicial investigation by due process of law under the forms and with the machinery provided by the wisdom of successive ages for the investigation judicially of the truth of a matter in controversy, and substitutes therefor, as an absolute finality, the action of a railroad commission, which, in view of the powers conceded to it by the state court, cannot be regarded as clothed with judicial functions or possessing the machinery of a court of justice."

A reading of the statute considered in that case shows that notice was contemplated and served, and the company appeared and was heard.

In Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014, a Texas statute provided for a hearing after notice, that the order of the commission should be conclusive, and be deemed and accepted to be reasonable and fair, and should not be controverted until finally found otherwise in an action brought against the commission in a court of competent jurisdiction in Trevis county, Tex. The statute then regulated the action by which such decision should be reviewed. It was held that an action could be maintained in the United States court for an adjudication that the rate so fixed by the commission was unreasonable; the court saying at page 397 of 154 U. S., page 1054 of 14 Sup. Ct. (38 L. Ed. 1014):

"It is doubtless true, as a general proposition, that the formation of a tariff of charges for the transportation by a common carrier of persons or property is a legislative or administrative, rather than a judicial, function. Yet it has always been recognized that, if a carrier attempted to charge a shipper an unreasonable sum, the courts had jurisdiction to inquire into the matter and to award to the shipper any amount exacted from him in excess of a reasonable rate, and also, in a reverse case, to render judgment in favor of the carrier for the amount found to be a reasonable charge. The province of the courts is not changed, nor the limit of judicial inquiry altered, because the Legislature, instead of the carrier, prescribes the rates. The courts are not authorized to revise or change the body of rates imposed by a Legislature or a commission. They do not determine whether one rate is preferable to another, or what under all circumstances would be fair and reasonable as between the carriers and the shippers. They do not engage in any mere administrative work; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a Legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and, if found so to be, to restrain its operation."

And again, at page 398 of 154 U. S., page 1054 of 14 Sup. Ct. (38 L. Ed. 1014):

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring the process of law for its determination."

And at page 399 of 154 U. S., page 1055 of 14 Sup. Ct. (38 L. Ed. 1014):

"These cases all support the proposition that, while it is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage, it is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates,

operates to deny to the owners of property invested in the business, of transportation that equal protection which is the constitutional right of all owners of other property. There is nothing new or strange in this. It has always been a part of the judicial function to determine whether the act of one party (whether that party be a single individual, an organized body, or the public as a whole) operates to divest the other party of any rights of person or property. In every Constitution is the guaranty against the taking of private property for public purposes without just compensation. The equal protection of the laws, which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men, and it must never be forgotten that under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must in their actual workings stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property legally acquired and legally held."

Again:

"The Legislature has the power to fix rates, and the extent of judicial interference is protection against unreasonable rates." Chicago, etc., Railway Co. v. Wellman, 143 U. S. 339, at page 344, 12 Sup. Ct. 400, at page 402, 36 L. Ed. 176; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, at page 398, 14 Sup. Ct. 1047, at page 1054, 38 L. Ed. 1014; Smyth v. Ames, 169 U. S. 466, at page 524, 18 Sup. Ct. 418, at page 425, 42 L. Ed. 819; Lake Shore, etc., Railway Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858.

This judicial review means due process of law.

"Due process of law 'means law in its regular course of administration through the courts of law' (2 Miller on the Constitution, p. 664); or 'a regular trial according to the course and usage of the common law' (4 Lincoln's Const. Hist. p. 37)." People v. Johnson, 185 N. Y. 219, 228, 77 N. E. 1164, 1167.

"To say, as has been suggested, that 'the law of the land,' or 'due process of law,' may mean the very act of legislation which deprives the citizen of his rights, privileges, or property, leads to a simple absurdity. The Constitution would then mean that no person shall be deprived of his property or rights, unless the Legislature shall pass a law to effectuate the wrong; and this would be throwing the restraint entirely away. The true interpretation of these constitutional phrases is that, where rights are acquired by the citizen under the existing law, there is no power in any branch of the government to take them away; but where they are held contrary to the existing law, or are forfeited by its violation, then they may be taken from him, not by an act of the Legislature, but in the due administration of the law itself, before the judicial tribunals of the state. The cause or occasion for depriving the citizen of his supposed rights must be found in the law as it is, or, at least, it cannot be created by a legislative act which aims at their destruction. Where rights of property are admitted to exist, the Legislature cannot say they shall exist no longer; nor will it make any difference, although a process and a tribunal are appointed to execute the sentence." Wynehamer v. People, 13 N. Y. 378, 392, 393.

"It is plain, therefore, both upon principle and authority, that these constitutional safeguards in all cases require a judicial investigation, not to be governed by a law specially enacted to take away and destroy existing rights, but confined to the question whether, under the pre-existing rule of conduct, the right in controversy has been lawfully acquired and is lawfully possessed." Id. 395.

In Brooklyn U. G. Co. v. City of New York, supra, it was held, the plaintiff having furnished and the defendant having received gas pursuant to a statute fixing the price, that the defendant could not question the reasonableness of the price for the gas so received. If we

reverse the situation, it may follow that, if defendant furnishes gas pursuant to a statute fixing the price, it cannot thereafter make a claim against the purchaser for the gas so furnished at other than the price so fixed. In such cases the parties by furnishing and receiving gas may be held to have assented to the price. It may be that a rate so fixed must be challenged in a direct action or proceeding to have the rate declared void, and that the parties cannot contest the statutory price for gas which has been furnished and used, presumably, under the terms of the statute. It is not material here to consider what the particular remedy is. That there is a legal remedy in the courts is beyond question.

It follows, from this reasoning, that before the enactment of the statute in question the defendant was by common law charged with the legal duty and clothed with the legal right of receiving a reasonable compensation for its service, and the courts of justice were always open to it to protect such rights. To prevent extortion, and to force upon the defendant the performance of its legal duty, the observance of its contract with the public, the Legislature may name a reasonable rate, or may create an administrative committee charged with that duty. When fixed, such rate is binding until it is adjudged to be unreasonable by a court of competent jurisdiction. Where A. seeks in the courts to require B. to observe his legal duty and carry out his contract to A., the questions of confiscation and destruction of property are not discussed. The only question is, what are the contract obligations of the parties? And when those obligations are determined, the judgment of the court follows. That is the situation here. The defendant is the owner of its plant, and may carry on its business in its own way, subject, however, to the duties and contract obligations it owes to the public. The nature of its calling charges upon it, and its property, only the obligation of furnishing gas and electricity to all alike, in a reasonable manner, and at a reasonable price. That is the only contract between the parties. If the public seeks to enforce upon it obligations and conditions beyond that duty, and beyond the terms of the contract, it is a proper question for the courts to decide just what the contract is, and to require its performance according to the letter and the spirit thereof. No legislation can destroy or change the effect of the contract between the parties, or deprive either of them of the right to have the courts adjudge the obligations and duties arising under such contract.

The legislation in question, passed while the defendant was engaged in its present business, is not a reasonable exercise of the police power, and imposes upon defendant obligations beyond and outside of its legal duty, and is therefore unconstitutional. The provision of the statute that the commission fix a rate "within the limits prescribed by law" requires it to fix a reasonable rate, and recognizes that the common law prescribes a rate. The provision that the commission shall give notice and hold a public hearing, and after such hearing, "and upon such investigation as may have been made by the commission, or its officers, agents or inspectors," may fix the maximum price, etc., would be a proper procedure for a purely administrative commission, but not for a court. The statute provides:

"The price so fixed by the commission shall be the maximum price to be charged by such person or corporation for gas or electricity in such municipality for a term of three years and until, after the expiration of such term, such commission shall upon complaint, as provided in this section, again fix the price of such gas or electricity."

The complaint referred to is a complaint made by the consumers, or by the local authorities, only. It is further provided that the orders of the commission may be enforced by mandamus, and that upon proof that the order has been made and has not been complied with, after notice thereof, the court may issue a mandamus to enforce it. The word "may," in a public statute giving a remedy of this kind, means "must."

It is evident that these provisions of the statute attempt to fasten upon the defendant the order of this administrative commission as a final and conclusive determination of its rights. The only defense admissible in the mandamus proceeding is either that the order was not made or that it has been complied with. The order may be based, not only upon the evidence and proceedings had before the commission at the public hearing, but upon an ex parte statement of the officers, agents, and inspectors of the commission, or one of the commissioners, as to what they discovered upon a private investigation of the plant, books, and method of such corporation, and which investigations the statute contemplates shall be made before the notice and public hearing. The defendant has no means of knowing what such ex parte reports are, and consequently it has no opportunity of controverting the conclusions reached by such officers or agents, or examining them with relation thereto. Until the judge presiding at a trial may adjourn court and take the ex parte statements of the sheriff, the stenographer, the deputy sheriffs in attendance, and the other officers and employés of the court, this investigation cannot be considered as due process of law.

It is against the common-law rights of the defendant, which is entitled to receive a reasonable price for its product, as conditions change from time to time, that the Legislature may dictate a price binding upon it for three years, and perpetually unless the local authorities or the customers desire a change. Heretofore, when the producer fixed the price, we may assume that the margin of profit was so large that it was not seriously affected by the change in the cost of the different items going to make up its product. But now a change has taken place, and it is assumed that the price of gas and electricity will be regulated so as to give only a fair profit from the business. The difference between a profit and a loss to the producer may be made up entirely by the changes in the price of wages, material, coal, oil, copper, and other things entering into the expense account. The experience of the last three years has demonstrated that what was a reasonable price three years ago is an unreasonable price now. The commission is not required to fix a present reasonable price for gas and electricity, but a price which will be reasonable for a period of three years, allowing them to forecast the future and to determine at their will, whether times will be good or bad during that time. A conscientious commission, under this statute, is not performing its duty by consid-.

ering the mere cost at the present time; for the rate to be fixed extends into the future, and we do not know whether it is decreed by this order that prices of everything shall go still higher or that they shall recede to the basis of three years ago. The provision that the consumers, or the municipality, after three years, may make complaint and have the price again adjusted, but giving the producer no right to a rehearing, denies to the defendant the equal protection of the law. The plain meaning of the statute is that, if anything going to make up the price of gas and electricity falls in the market, the public may have a reduction in the price, but, if everything advances, the defendant must perpetually serve at the same price.

An appeal to the Appellate Division is permitted, in which case the commission appears by the Attorney General as a party to the litigation. The right to appeal from the act of an administrative board does not make the act of that board, or the result of the appeal, due process of law, or make final an order which is only prima facie evidence of reasonableness. We have seen that it is not a part of the duty of the court to prescribe rates, but that its full duty is performed when it decides whether a given rate is reasonable or unreasonable. The Appellate Division has no knowledge as to how far the things seen by one of the commissioners, or their officers, agents or inspectors, have entered into the determination. It is evident that the decision of an appellate court upon such a record is not the judicial investigation which is the common-law right of the defendant. If this court were to go outside of its functions and undertake the administrative duty of fixing a rate, it is bound by the provision of the statute which, in substance, requires a rate to be fixed which shall be reasonable for three years, and as against the company forever, unless the other party to the controversy asks to have it changed. It follows that if the order of the commission is improper, for the reasons suggested, no action of the Appellate Division can give it validity, and this court may well refuse to become an administrative commission. The court may properly limit its inquiry to a review of the order of the commission, and give judgment affirming or annulling it.

Reference is made to the public service commission law (chapter 429, p. 889, Laws of 1907), which went into effect shortly after the order in question was made; and it is urged that the defendant is not injured by this order, even if the provisions of the statute under which it was made are unconstitutional. The new statute permits the commission to grant rehearings upon its orders. It is not given the power to grant rehearings upon orders made by the former commission. There is no provision in the new statute which relieves the defendant from the force of the order appealed from. Its only remedy is the judgment of the court. The validity of the present order must be determined by the terms of the statute under which it was made.

The contention that, if the order of the commission is void, we have no right to review it, is unsound. The statute, so far as it creates a commission, is valid, and that commission has the right to make various orders, many of which are proper, and an appeal is permitted to this court from any of its orders. The rule in the Purdy Case, supra, indicates the validity of such an order, if made as to a business estab-

lished after the statute was passed. The question here presented is whether the order in question is one which the commission was authorized to make.

In my judgment, the order is invalid. It should therefore be .annulled, with costs.

SEWELL, J., concurs in this dissent.