THE PEOPLE, PETITIONER, v. NEAGLE, RESPONDENT.

APPLICATION for a Writ of *Mandamus* Directed to the Respondent as Treasurer of the Miramar Shop Company Commanding Him to File with the Treasurer of Porto Rico a Certificate for the Assessment of License Taxes.

No. 142.—Decided August 1, 1914.

MANDAMUS—JURISDICTION—LICENSE TAXES.—A writ of *mandamus* lies to compel a person who has refused to do so to file with the Treasurer of Porto Rico a certificate for the assessment of license taxes, pursuant to Act No. 134 of August 12, 1913, and the Supreme Court, in its discretion, has original jurisdiction of such proceeding.

PEOPLE OF PORTO RICO—SOVEREIGN POWERS.—Since the Supreme Court of the United States decided the case of *The People* v. *Rosaly*, 227 U. S., 270, there is no doubt that Porto Rico enjoys substantially all the sovereign powers possessed by any state of the Union, subject to revision and annulment by the Congress of the United States.

LICENSE TAXES.—The Legislative Assembly of Porto Rico may impose industrial and commercial license taxes, and the Foraker Act contains no provision prohibiting the exercise of such faculty.

ID.—CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE POWER.—Act No. 134 of August 12, 1913, is not unconstitutional, and the fact that it authorizes the Treasurer of Porto Rico to classify commercial establishments and divide some of them into five classes for the purpose of imposing upon each class the amount of taxes prescribed by the said act, is not a delegation of legislative power to the Treasurer, but is an administrative power and does not render the said act unconstitutional.

ID.—CLASSIFICATION OF ESTABLISHMENTS—ARBITRARY AND UNJUST POWERS.—Act No. 134 of August 12, 1913, relative to industrial and commercial licenses, does not contain the defect of conferring arbitrary and unjust powers upon the Treasurer of Porto Rico to classify commercial and industrial establishments, and the fact that the act in one instance divides such establishments into five classes and in others less, does not affect the validity of the said act.

ID.—CLASSIFICATION OF ESTABLISHMENTS—RATE OF TAXATION.—The fact that Act No. 134 of August 12, 1913, delegated to the Treasurer of Porto Rico the administrative faculty of imposing upon each class of business or industry classified by him by virtue of said faculties the rate formerly prescribed by the act for each class, does not render the said act null and unconstitutional because of its failure to fix a more definite rate of taxation, inasmuch as the manner in which the rate is fixed is sufficient.

CONSTITUTIONAL LAW—CONSTRUCTION OF LAW.—It is the duty of a court to follow the intention of the legislative power and not hold an act to be unconstitutional unless it is clearly shown to be so.

LICENSE TAXES—COLLECTION OF BACK TAX—PROMULGATION OF REGULATIONS—
CONSTITUTIONAL LAW.—The fact that a tax law has a retroactive effect does
not imply necessarily that it is unconstitutional, and the fact that the
Treasurer of Porto Rico promulgated the regulations for the collection of
license taxes subsequently to January 1, 1914, when the first quarterly pay-
ment of said taxes became due, does not prevent his demanding the payment
of said back taxes, nor does it make the act of presenting the certificate
for the amount of said taxes by the Miramar Shop Company impossible to
execute.

The facts are stated in the opinion.

*Messrs. Wolcott H. Pitkin, Jr.,* Attorney General of Porto
Rico, and *Robert Szold,* law clerk, for the petitioner.

The respondent filed a brief *pro se.*

MR. JUSTICE WOLF delivered the opinion of the court.

The question in this case is whether the Treasurer of
Porto Rico has a right to compel the Miramar Shop Com-
pany to give an account of its volume of business in order
that the Treasurer may classify it into one of the five classes
designated in the Act of August 12, 1913, Laws of the Extra-
ordinary Session of 1913, page 90, Act No. 134.

The People of Porto Rico is the complainant in an appli-
cation for a *mandamus* and maintains that if a duty to fur-
nish such an accounting exists, then this court has jurisdic-
tion to issue a writ of *mandamus* to compel the performance
of such duty, inasmuch as it is a public one and the power
of the Legislature to levy a license tax of this kind, as well
as the constitutionality of the law itself, are involved. We
are satisfied that the position of The People of Porto Rico
is sound so far as the jurisdiction of this court and the pro-
priety of the issuance of the writ is concerned. Spelling on
Extraordinary Remedies, volume 2, section 601, and other
authorities cited in the brief of the Attorney General.

. The respondent concedes so much of the Government's
position as relates to the jurisdiction of this court. He does
not, however, concede the right of the Treasurer to collect
the tax or to exact a return from the Miramar Shop Com-
pany, of which the respondent is treasurer. The refusal of
the company to make a return is based on various grounds.

(1) The respondent maintains that the Legislature of Porto Rico has no power to levy license taxes upon businesses and occupations. And in furtherance of his position he urges that the power to tax must be specific, and he compares The People of Porto Rico to a municipal corporation or a city. In the case of *Rosaly* v. *The People,* 16 P. R. R., 481, this court attempted to say that The People of Porto Rico was not fully sovereign in the sense of a State. While neither in the majority opinion nor in the dissenting opinion was The People of Porto Rico compared to a municipality, yet the majority opinion attempted to urge that the Congress of the United States could fix rules for The People of Porto Rico as a State could for a municipal corporation. The case was appealed to the Supreme Court of the United States and since the decision therein (*People* v. *Rosaly,* 227 U. S., 270) there can be no doubt that Porto Rico has substantially all the powers of sovereignty possessed by any state of the Union subject to the revision or annulment of Congress of the United States, and the right of a Territory to exercise sovereign powers has been recognized ever since the case of *Clinton* v. *Englebrecht,* 13 Wall., 435. The question raised by respondent was squarely presented to this court in the case of the *Ponce Lighter Company* v. *Ponce,* 19 P. R. R., 725, 751, and we may repeat what we said there:

"Respondent draws our attention to the fact that no direct draft of power to tax occupations is given by the Foraker Act. But there is no real limitation. Section 38 says that taxes and assessments on property may be levied, and forbids certain other taxation, but the limitation on the power of taxation is not to be lightly inferred when Congress in various sections has given Porto Rico governmental and legislative powers."

And we say again, as we said in the Ponce case, that license taxes have always been collected by the municipalities, and the law of August 12, 1913, was only an attempt to put in the hands of the Treasurer the power that had always been exercised by

the municipalities, and by the Foraker Act the laws and ordinances theretofore existing were continued in force. The respondent attempts to prove too much. There is, for example, no draft of power of eminent domain, and probably the Foraker Law is silent about other legislative powers necessarily conferred and exercised by The People of Porto Rico.

(2) Respondent maintains that Act No. 134 is unconstitutional and void in that it delegates legislative power to the Treasurer of Porto Rico, contrary to the Constitution of the United States and to the Organic Act. Section 2 of the act provides that the businesses covered by the act "shall be classified by the Treasurer of Porto Rico into one of the classes hereinafter mentioned, according to its relative importance as measured by the volume of business transacted within Porto Rico irrespective of the net gain or profit derived therefrom, and as compared with other similar businesses or industries throughout Porto Rico." The respondent admits that legislatures may adopt primary standards and leave to administrative officials the duty of filling in "details" so as to make the law operative. He submits, however, that the Legislature of Porto Rico has not set a primary standard within the meaning of the decisions which the Government in its brief relies on. We shall give a resumé of these decisions.

In *Field* v. *Clark,* 143 U. S., 649, the Tariff Act of 1890 provided, with a view to secure reciprocal trade with countries producing sugar, molasses, etc., that whenever and so often as the President should be satisfied that the government of any country producing and exporting sugars, molasses, coffee, etc., or any of such articles, was imposing duties or other exactions upon the agricultural or other products of the United States which he might deem to be reciprocally unequal and unreasonable, he should have the power, and it should be his duty, to suspend the provisions of the act for such time as he should deem just. When the constitutionality of this statute was raised, Mr. Justice Harlan said:

(p. 692). "That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution. The act of October 1, 1890, in the particular under consideration, is not inconsistent with that principle. It does not, in any real sense, invest the President with the power of legislation."

In *Buttfiield* v. *Stranahan*, 192 U. S., 470, an act of Congress made it unlawful for any person * * * to import * * * any merchandise as tea which was inferior in purity, quality, and fitness for consumption to the standards prescribed in section 3 of this act. And section 3 provides that the Secretary of the Treasury, upon the recommendation of said board (of tea experts), should fix and establish uniform standards of purity, quality and fitness for consumption of all kinds of teas imported. Teas were classified by the Secretary of the Treasury into thirteen classes. *Held*, that the power delegated to the Secretary of the Treasury to fix the standard of inferior teas was not unlawfully delegated by Congress. The court, speaking through Justice White, said:

(p. 496). "The claim that the statute commits to the arbitrary discretion of the Secretary of the Treasury the determination of what teas may be imported, and therefore in effect vests that official with legislative power, is without merit. We are of opinion that the statute, when properly construed, as said by the Circuit Court of Appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality. *This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute.* The case is within the principle of *Field* v. *Clark*, 143 U. S., 649. * * * Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."

In *Union Bridge Co.* v. *United States,* 204 U. S., 364, an act of Congress made it the duty of the Secretary of War to require all bridges to be altered whenever the Secretary of War should have reason to believe that any railroad or other bridge * * * over any of the navigable waterways was an unreasonable obstruction to the free navigation of such waters on account of insufficient height, etc. *Held,* that the act was not unconstitutional as conferring legislative powers upon the Secretary of War. The cases were reviewed in the opinion and the principle that it was sufficient, if the Legislature prescribed the primary standard, was approved. The court said:

(p. 386). "Beyond question, if it had so elected, Congress, in some effective mode and without previous investigation through executive officers, could have determined for itself, primarily, the fact whether the bridge here in question was an unreasonable obstruction to navigation, and, if it was found to be of that character, could by direct legislation have required the defendant to make such alterations of its bridge as were requisite for the protection of navigation and commerce over the waterway in question. But investigations by Congress as to each particular bridge alleged to constitute an unreasonable obstruction to free navigation and direct legislation covering each case, separately, would be impracticable in view of the vast and varied interests which require National legislation from time to time. By the statute in question Congress declared in effect that navigation should be freed from unreasonable obstructions arising from bridges of insufficient height, width of span or other defects. It stopped, however, with this declaration of a general rule and imposed upon the Secretary of War the duty of ascertaining what particular cases came within the rule prescribed by Congress, as well as the duty of enforcing the rule in such cases. In performing that duty the Secretary of War will only execute the clearly expressed will of Congress, and will not, in any true sense, exert legislative or judicial power."

In *St. Louis Railway* v. *Taylor,* 210 U. S., 281, the Safety Appliance Law provided that freight cars should be provided with draw-bars of uniform height. The uniform height was

to be fixed by the Interstate Commerce Commission upon the recommendation of the American Railway Association. *Held,* that the act did not provide for an unconstitutional delegation of legislative authority.

In *United States* v. *Grimaud,* 220 U. S., 506, an Act of Congress reserved certain forest lands and provided that the Secretary of Agriculture should make such rules and regulations and should establish such service as would insure the objects of such reservation, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction. The violation of a rule established by the Secretary of Agriculture was made a crime. In holding the statute constitutional, the court said:

(p. 517). "From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress or measured by the injury done."

Similar questions and similar rulings were given by the Supreme Court of the United States in *Red "C" Oil Mfg. Co.* v. *Board of Agriculture of North Carolina,* 222 U. S., 380, and in *Interstate Commerce Commission* v. *Goodrich Transit Company,* 224 U. S., 194, and the extent of the discretionary power granted to the Interstate Commerce Commission by the Interstate Commerce Act was again shown in the case of *Kansas City So. Railway Co.* v. *United States,* 231 U. S., 423, where the court said:

(231 U. S. 443). "There is here no unconstitutional delegation of legislative powers. The reasoning adopted in *Interstate Com. Com.* v. *Goodrich Transit Co.,* 224 U. S., 194, 210, etc., is controlling. And

since, as just shown, uniformity in accounting is dependent upon the adoption and enforcement of precise classification, the authority to define the terms of the classification necessarily follows. *It amounts, after all, to no more than laying down the general rules of action under which the Commission shall proceed, and leaving it to the Commission to apply those rules to particular situations and circumstances by the establishment and enforcement of administrative regulations.*"

A case exactly in point, and which the respondent concedes to be in point, was that of *Ould & Carrington* v. *City of Richmond,* 23 Graft. (Va.), 464, 14 Am. Rep., 139. Action was brought by Ould & Carrington against the City of Richmond to recover taxes paid under protest. The taxes were collected by virtue of a city ordinance which divided lawyers into six classes, levied a license tax of a certain amount upon the lawyers of each class, and charged the finance committee of the city council with the duty of assigning the lawyers to the class to which they respectively belonged. Section 11 of the statute provided "that the committee of finance shall place each person and firm, employed in the trade or business referred to in sections 3, 4, 5, 7, and 8, in the class to which the committee shall be of opinion such person or firm properly belongs, looking into all the circumstances of the case." The committee was directed to give notice of the classification by publication in two of the papers of the city, so that all persons feeling themselves improperly classified could appear and correct the error, if any.

The validity of a license tax or ordinance similar to that upheld in the City of Richmond case, *supra,* was attacked and upheld in *Bradley* v. *City of Richmond,* 110 Va., 521, 66 S. E., 872. The case was taken to the Supreme Court of the United States where the judgment was affirmed. This case involved the construction of the Fourteenth Amendment to the Constitution of the United States; in other words, whether there was due process of law, and while the Supreme Court

of the United States did not discuss the delegation of legislative power in that case, the court said:

(227 U. S., 481). "The objection to the ordinance does not grow out of any contention that there may not exist just and reasonable distinctions justifying a greater tax upon some of these persons or firms engaged in doing what is called a 'private banking' business than upon others engaged in the same general business; but arises from the fact that the law provides no rule by which some are to be placed in one class and some in another. An ordinance which commits to a board, committee or single official the power to make an *arbitrary* classification for purposes of taxation, would meet neither the requirement of due process, nor that of the equal protection of the law."

The respondent, however, maintains that the power of classification given to the Treasurer of Porto Rico is arbitrary and unreasonable. He urges that the law does not say that there must be five classes in each industry and that it does not compel the Treasurer to put at least one concern in each class. He urges that the Treasurer might put every sugar mill in the Island in the first class and be well within the power given him by the law. That the Legislature does not say whether a difference of one dollar per year in the volume of business is to be the dividing line between the classes or whether it should be ten thousand dollars. Respondent maintains that there are no boundaries in the Treasurer's discretion and that the Legislature has set no standards. He urges that the Treasurer is not required to find out any single fact or facts, but must determine a number of facts practically to impose a tax.

We cannot see how it makes any difference that in one case the requirement is that the industry be divided into five classes while in other cases it is less. We cannot see that it makes any difference that the Treasurer is given a wide descretion provided that his powers are administrative rather than legislative. The question always remains, under the words of the statute and the legislative history of the coun-

try, whether the powers conferred have been recognized as administrative rather than legislative. A specific case has been found in *Ould & Carrington, supra.* The respondent does not attempt to distinguish the case, but he attacks the reasoning. The reasoning may not be entirely satisfactory but the judgment remains a fact, and a court of the United States has decided that similar powers to those conferred by Act No. 134 upon the Treasurer of Porto Rico are administrative rather than legislative.

We shall examine the act itself. In the first place it appears therein that a tax must not be above or below an amount fixed by the Legislature itself. The tax must then be measured according to the volume of business. It must be proportioned to like businesses throughout Porto Rico. In other words the tax must be according to some scheme or proportion dependent upon the classes fixed by the statute, otherwise it would be arbitrary and unreasonable and a recourse might be had to the courts. Where there is a wide disparity in the volume of business, it is evident that the highest volume may be taxed at the highest rate provided a similar high rate prevails in like businesses, and, generally, the occupations with a smaller volume of business must be taxed somewhat in proportion. The whole law perhaps is not very scientific. The Legislature could, perhaps, have enacted more definite standards. Yet we cannot say that the Treasurer, in following the rules laid down by the Legislature, is making law, because we agree with the Government that the law has already been made. The Treasurer is limited on all sides. Not only the law as set forth limits him, but there is an appeal from his decision to a board of three of which he is a member. Similar powers to those here given to the Treasurer are frequently given to railroad commissions to fix railroad rates and the constitutionality of such delegation of powers has been sustained in various cases. *State* v. *Atlantic Coast Line R. Co.,* 47 So. Rep., 969; *Trustees of Saratoga Springs* v. *Saratoga Gas, etc., Co.,* 122 App. Div.,

214; *State* v. *Railroad Commission,* 100 Pac., 184; 8 Cyc., 834. Mr. Justice Brewer, in the case of *Chicago and Northwestern Railway Company* v. *Day,* 35 Fed. Rep., 874, said:

"The constitution of the state of Iowa, as those in other states, divides the government into three deparments, the legislative, the executive, and the judicial; and in article 3, par. 1, declares that 'no person, charged with the exercise of powers properly belonging to one, shall exercise any functions appertaining to either of the others.' By another section the legislative power is vested in a general assembly, consisting of two bodies,—the senate and the house. No provisions exist in the constitution for a railroad commission. Hence counsel conclude that the legislature is the only body which can fix rates, and that it may not abdicate its functions and delegate this legislative power to another body. Of course, this question is pivotal; for if the legislature alone can fix rates, the railroad commissioners are exercising functions which do not belong to them; and if the rates proposed infringe upon the property rights of the complainant, it may insist that such unauthorized action of the commissioners be stayed. It is not always easy to answer an argument so simple and clear, where each of the propositions is, in a general sense, at least, confessedly true. I concede the force of the argument, and yet I do not think I should be warranted in sustaining the claim, and for these reasons:

"*First.* It is elemental that a law will not be declared unconstitutional unless its vice is obvious. As said by Chief Justice Waite in the Mumm Case, *supra*: 'Every statute is presumed to be constitutional. The court ought not to declare one unconstitutional unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained.' Or, as has been elsewhere epigrammatically said, 'A doubt sustains the law.'

"*Second.* There is no inherent vice in such a delegation of power; nothing in the nature of things which would prevent the state, by constitutional enactment at least, from intrusting these powers to such a board; and nothing in such constitutional action which would invade any rights guaranteed by the federal constitution. So that, after all, the question is one more of form than of substance. The vital question with both shipper and carrier is that the rates shall be just and reasonable, and not by what body they shall be put in force.

"*Third.* While, in a general sense, following the language of the supreme court, it must be conceded that the power to fix rates is legislatave, yet the line of demarkation between legislative and administrative functions is not always easily discerned. The one runs into the other. The law books are full of statutes unquestionably valid, in which the legislature has been content to simply establish rules and principles, leaving execution and details to other officers. Here it has declared that rates shall be reasonable and just, and committed what is, partially at least. the mere administration of that law to the railroad commissioners. Suppose, instead of a general declaration that rates should be reasonable and just, it had ordered that the rates should be so fixed as to secure to the carrier above the cost of carriage 3 per cent upon the money invested in the means of transportation, and then committed to the board of railroad commissioners the fixing of a schedule to carry this rule into effect, would not the functions thus vested in such a board be strictly administrative? While, of course, the cases are not exactly parallel, yet the illustration suggests how closely administrative functions press upon legislative power, and enforce the conviction that that which partakes so largely of mere administration should not hastily be declared an unconstitutional delegation of legislative power.

"*Fourth.* The reasonableness of a rate changes with the changed condition of circumstances. That which would be fair and reasonable today, six months or a year hence may be either too high or too low. The legislature convenes only at stated periods; in this state once in two years. Justice will be more likely done if this power of fixing rates is vested in a body of continual session than if left with one meeting only at stated and long intervals. Such a power can change rates at any time, and thus meet the changing conditions of circumstances. While, of course, the argument from inconvenience cannot be pushed too far, yet it is certainly a matter of inquiry whether in the increasing complexity of our civilization, our social and business relations, the power of the legislature to give increased extent to administrative functions must not be recognized.

"*Fifth.* The decisions of the supreme court of the state as to whether such a delegation of power conflicts with the state constitution must be accepted in the federal court as final. And a federal court should not hurry to declare that unconstitutional which the state court may subsequently hold to be valid; especially when the supreme courts of some sister states have already upheld similar enactments. Finally, whatever of direct authority upon the question exists, sustains this delegation of power.

"In the recent case, *State* v. *Railroad Company*, 37 N. W. Rep., ·782, the supreme court of Minnesota considered this question, and sustained a similar enactment. See, also, the case of *State* v. *Railroad Company*, 35 N. W. Rep., 118, and 36 N. W. Rep., 308, (decided by the Supreme Court of Nebraska). In the case of *Tilley* v. *Railroad Company*, 5 Fed. Rep., 641, Mr. Justice Woods of the supreme court of the United States, sitting on the circuit, also considered the question in a carefully prepared opinion, and sustained a similar enactment. See, also, other cases cited in the opinion of the supreme court of Minneapolis, *supra*. Beyond that, in the case of *Stone* v. *Trust Co.*, 116· U. S., 307, 6 Sup. Ct. Rep., 334, the validity of the act of the state of Mississippi, delegating like power to a board of railroad commissioners, was before the supreme court of the United States, and, though this specific objection was made by counsel to its validity, the act was sustained. True, no special reference was made to this question in the opinion, and it was intimated that there might be questions arising under portions of the act thereafter to be determined, so that possibly that case cannot be taken as an authoritative determination by that court of this question; still, as I said, all the authorities that have been cited, or that I have been able to find, bearing upon this precise question, are in favor of the constitutionality of such a delegation of power. For these reasons I conclude that this contention of the complainant cannot be sustained."

We also might have some doubt, but, as was quoted by Mr. Justice Brewer, "a doubt sustains the law." The duty of a court to follow the will of the Legislature, unless the unconstitutionality of an act clearly appears, was also laid down by us in the case of the *Ponce Lighter Company* v. *Ponce,* 19 P. R. R., 725, 751, and authorities there collected.

(3) The respondent maintains that the act is impossible of performance. The theory of the respondent appears to be that the tax, if due at all, was due under the terms of the act on January 1, 1914; that as at that time the Treasurer had obtained no certificate from the Miramar Shop Company he was in no position to demand the payment of tax due on the first of the year; that the occupations named in the act are forbidden to engage in business until they have paid the

tax; that the Treasurer did not promulgate his regulations for a tax due January 1, 1914, until January 23, 1914. · That by reason of these inconsistent provisions and actions the act is impossible of performance.

If section 3 of the act be examined, it will be seen that the person thereunder is prohibited from carrying on a business "until" or "unless" the corresponding license tax has been paid. By section 4 the tax is due on the first days of January, April, July, and October of each year. The Government, it is true, is seeking to collect the tax due on January 1, 1914, but the act must be given a reasonable construction. If the Treasurer, because of a lack of adequate information, has not collected the tax due on January 1, 1914, which by sections 9 and 10 of the act he is authorized to demand of the Miramar Shop Co., the mere fact that he has not collected such tax on time would not prevent him from demanding the payment when the information is in his possession. Section 3 says "until" or "unless" the tax is paid and under the act a person is not entitled to carry on his business unless he has paid his tax, but he cannot be said to have failed to pay his tax until such tax is determined. The word "unless" would indicate that the payment may not be exacted until the tax is duly fixed. But the resistance by the Miramar Shop Co. to give the desired information would not prevent the Treasurer to collect back taxes when the information was obtained. It seems that real estate taxes are similarly collected. The fact that a tax statute operates retrospectively does not necessarily cause it to be unconstitutional, says the Supreme Court of the United States in the case of *Billings* v. *United States,* 232 U. S., 261, and a fortiori the fact that something is to be done after a tax falls due to determine the amount thereof would not prevent its collection. The Treasurer was authorized to demand the information and it was the duty of the Miramar Shop Co. to give it.

The regulations seem to be reasonable and no serious attack is made on them. The permanent writ of *mandamus* should be issued.

> *Petition granted and ordered that a peremptory writ of mandamus be directed to the defendant to file the sworn certificate required by the Treasurer of Porto Rico within ten days.*

Chief Justice Hernández and Justices del Toro and Aldrey concurred.

Mr. Justice Hutchison took no part in the decision of this case.