EL PUEBLO, PETICIONARIO, *v.* NEAGLE, DEMANDADO.

SOLICITUD para que se expida auto de *mandamus* al demandado como Tesorero de la Miramar Shop Company, obligándole a que presente al Tesorero de Puerto Rico una planilla de contribución de patentes.

No. 142.—Resuelto en agosto 1, 1914.

MANDAMUS—JURISDICCIÓN DEL TRIBUNAL SUPREMO—CONTRIBUCIONES DE PATENTES.—El recurso de *mandamus* procede para obligar a una persona que se niega a ello a presentar al Tesorero de Puerto Rico una planilla de contribución de patentes, de acuerdo con la Ley No. 134 de agosto 12, 1913, y el Tribunal Supremo tiene en su discreción jurisdicción original para conocer de tal procedimiento.

PUEBLO DE PUERTO RICO—PODERES DE SOBERANÍA.—Desde que la Corte Suprema de los Estados Unidos resolvió el caso de *El Pueblo v. Rosaly*, 227 U. S., 270, es indudable que Puerto Rico tiene substancialmente todos los poderes de soberanía poseídos por cualquier Estado de la Unión sujetos a ser revisados y anulados por el Congreso de los Estados Unidos.

CONTRIBUCIONES DE PATENTES—FACULTADES DE LA ASAMBLEA LEGISLATIVA—LEY FORAKER.—La Asamblea Legislativa de Puerto Rico tiene facultades para imponer contribuciones de patentes industriales y comerciales, y la Ley Foraker no contiene precepto alguno que le prohiba el ejercicio de dicha facultad.

ID.—CLASIFICACIÓN DE LOS NEGOCIOS POR EL TESORERO DE PUERTO RICO—DERECHO CONSTITUCIONAL—DELEGACIÓN DE FACULTADES LEGISLATIVAS.—La Ley No. 134 de agosto 12, 1913, no es anticonstitucional, y el hecho de que el Tesorero de Puerto Rico haya sido autorizado por dicha ley para hacer una clasificación de los comerciantes e industriales y dividir algunos de ellos en cinco clases con el fin de imponer a cada clase el tipo de contribución marcado en dicha ley, no constituye una delegación de facultades legislativas al Tesorero, sino de facultades de carácter administrativo que no vician dicha ley por ese motivo del defecto de ser anticonstitucional.

ID.—CLASIFICACIÓN DE LOS NEGOCIOS POR EL TESORERO DE PUERTO RICO—FACULTADES ARBITRARIAS E INJUSTAS.—Tampoco adolece la Ley No. 134 de agosto 12, 1913, sobre contribución de patentes industriales y comerciales, del defecto de conferir al Tesorero de Puerto Rico facultades arbitrarias e injustas para clasificar los comerciantes e industriales, y el hecho de que la ley establezca en un caso cinco clases de comerciantes e industriales y en otros menos, no afecta la validez de dicha ley.

ID.—CLASIFICACIÓN DE LOS NEGOCIOS POR EL TESORERO DE PUERTO RICO—TIPOS DE CONTRIBUCIÓN MARCADOS EN LA LEY—CLASIFICACIÓN RAZONABLE.—El hecho de que la Ley No. 134, de agosto 12, 1913, haya delegado al Tesorero de Puerto Rico la facultad administrativa de imponer a cada clase de los negocios e industrias clasificados por él en virtud de dichas facultades el tipo previamente marcado por la ley para cada clase, no quiere decir que dicha ley sea nula y anticonstitucional por no haber fijado un tipo de contribución más definido, pues en la forma en que lo ha hecho es suficiente.

DERECHO CONSTITUCIONAL—CONSTITUCIONALIDAD DE LAS LEYES—VOLUNTAD DEL
PODER LEGISLADOR.—El deber de un tribunal es seguir la voluntad del poder
legislador y no declarar anticonstitucional una ley, a menos que claramente
resulte inconstitucional.

CONTRIBUCIONES DE PATENTES—COBRO DE LA CONTRIBUCIÓN DESPUÉS DE VENCIDA—
PROMULGACIÓN DE LOS REGLAMENTOS CON POSTERIORIDAD A LA FECHA EN QUE
VENCIÓ LA CONTRIBUCIÓN—DERECHO CONSTITUCIONAL.—El hecho de que una
ley de contribuciones actúe retroactivamente no implica necesariamente el que
sea anticonstitucional y el que el Tesorero de Puerto Rico haya promulgado
los reglamentos sobre el cobro de contribución de patentes con posterioridad
al 1º. de enero de 1914 en que venció el primer trimestre de dicha contribu-
ción, no le impide el exigir el pago de dichas contribuciones atrasadas, ni
tampoco hace que el acto de presentación de las planillas de dicha contri-
bución por la Miramar Shop Company tenga la naturaleza de ser imposible
de ejecución.

Los hechos están expresados en la opinión.

Abogados del peticionario: Sres. *Wolcott H. Pitkin, Jr.,
Attorney General de Puerto Rico,* y *Robert Szold,* oficial
jurídico.

El demandado compareció por escrito en nombre propio.

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

La cuestión planteada en este caso es si el Tesorero de
Puerto Rico tiene derecho a obligar a la Miramar Shop Com-
pany a que le presente una cuenta de su volumen de nego-
cios para que el Tesorero pueda clasificarla como una de las
cinco clases designadas en la ley de agosto 12, 1913, Leyes
de la Sesión Extraordinaria de 1913, página 69, Ley No. 134.

El Pueblo de Puerto Rico es el peticionario en una solici-
tud de *mandamus* y sostiene que si existe el deber de presen-
tar tal cuenta entonces esta corte tiene jurisdicción para expe-
dir un mandamiento de *mandamus* y ordenar que se cumpla
con ese deber, por tratarse de un deber público y tanto el
poder de la Legislatura para imponer una contribución de
patentes de esta naturaleza como la constitucionalidad de
la ley en sí están envueltas en este caso. Estamos conven-
cidos de que la teoría del Pueblo de Puerto Rico en cuanto
afecta a la jurisdicción de esta corte y a la procedencia de
la expedición del auto de *mandamus* es ajustada a derecho.
Véase Spelling on Extraordinary Remedies, vol. 2, sec. 601,

y otras citas hechas en el alegato del Attorney General. El demandado admite aquella parte de las alegaciones del Gobierno que se refieren a la jurisdicción de este tribunal. Sin embargo, no admite el derecho del tesorero a cobrar la contribución ni a exigir una planilla a la Miramar Shop Company de la cual el demandado es tesorero. La negativa de la compañía a presentar tal planilla se funda en varios motivos.

(1) El demandado sostiene que la Legislatura de Puerto Rico no tiene poder para imponer contribuciones de patentes a los negocios ni a las ocupaciones. Y en apoyo de su teoría sostiene que el poder para imponer contribución debe ser específico y compara al Pueblo de Puerto Rico con una corporación municipal o ciudad. En el caso de *Rosaly* v. *El Pueblo,* 16 D. P. R., 508, este tribunal dijo que El Pueblo de Puerto Rico no era un soberano completo lo mismo que un Estado. Aún cuando ni en la opinión del tribunal ni en la opinión disidente se comparó al Pueblo de Puerto Rico con un municipio, sin embargo, en la opinión del tribunal se dijo que el Congreso de los Estados Unidos podía dictar reglas al Pueblo de Puerto Rico lo mismo que un Estado podría hacerlo para una corporación municipal. El caso fué apelado a la Corte Suprema de los Estados Unidos y desde que se dictó sentencia en él, *People* v. *Rosaly,* 227 U. S., 270, es indudable que Puerto Rico sustancialmente tiene todos los poderes de soberanía poseídos por cualquier Estado de la Unión sujetos a ser revisados o anulados por el Congreso de los Estados Unidos y el derecho de un territorio a ejercer poderes de soberanía ha sido reconocido desde que se resolvió el caso de *Clinton* v. *Englebrecht,* 13 Wall., 435. La cuestión planteada por el demandado fué también presentada de frente a este tribunal en el caso de *Ponce Lighter Company* v. *El Municipio de Ponce et al.,* 19 D. P. R., 760 y 790, y bien podemos repetir lo que entonces dijimos allí:

"La parte apelada nos llama la atención hacia el hecho de que en la Ley Foraker no hay precepto alguno que expresamente auto-

rice la imposición de contribuciones sobre industrias u ocupaciones.
Pero tampoco hay limitación alguna.  El artículo 38 establece que
pueden imponerse contribuciones a la propiedad y prohibe ciertas
contribuciones y no se puede deducir de una manera ligera que el
poder para imponer contribuciones haya sido limitado, cuando el
Congreso en varios artículos de dicha ley ha dado poderes legisla-
tivos y gubernamentales a Puerto Rico   *   *   *."

Y volvemos a decir como dijimos en el caso del Municipio de
Ponce que las contribuciones de patentes industriales siempre
han sido cobradas por los municipios y la ley de Agosto 12,
1913, sólo trató de poner en manos del Tesorero el poder que
siempre había sido ejercido por los municipios, y la Ley Fora-
ker continuó en vigencia las leyes y ordenanzas existentes ante-
riormente.

El demandado trata de demostrar demasiado.  Por ejem-
plo, no hay duda alguna de que existe el poder de expropia-
ción forzosa y tal vez la Ley Foraker guarda silencio en
cuanto a otras facultades legislativas que necesariamente han
sido conferidas y son ejercidas por El Pueblo de Puerto Rico.

(2) El demandado sostiene que la ley No. 134 es anticons-
titucional y nula porque delega facultades legislativas al Teso-
rero de Puerto Rico en contravención de la Constitución de
los Estados Unidos y la Ley Orgánica.  La sección 2 de dicha
ley dispone que el negocio a que se refiere tal ley "será clasi-
ficado por el Tesorero de Puerto Rico en una de las clases
que más adelante se mencionan, de acuerdo con la relativa
importancia del mismo, apreciado por el volumen de negocios
realizados en Puerto Rico sin tener en cuenta la ganancia neta
o provecho que produzcan, y según resulte de su compara-
ción con otros negocios o industrias similares en todo Puerto
Rico."  El demandado admite que las legislaturas pueden
adoptar tipos básicos y dejar a los funcionarios administra-
tivos el deber de ejecutar los detalles para que la ley sea efec-
tiva.  Alega él, sin embargo, que la Legislatura de Puerto Rico
no ha fijado ese tipo básico dentro de la significación de la

jurisprudencia que el gobierno en su alegato cita. Daremos un resumen de estas decisiones.

En el caso de *Field* v. *Clark,* 143 U. S., 649, la ley de tarifas de 1890 disponía que con el fin de obtener relaciones comerciales recíprocas con países productores de azúcar, mieles, etc., siempre que el presidente estuviera convencido de que el gobierno de cualquier país productor y exportador de azúcar, mieles, café, etc., o cualquier otro producto, impusiera derechos u otros impuestos a los productos agrícolas o de otra clase de los Estados Unidos que él creyera injustos y desiguales por reciprocidad él tendría el poder y el deber de suspender los preceptos de la ley por el tiempo que estimara justo. Cuando se atacó la constitucionalidad de esta ley el Juez Asociado Sr. Harlan dijo:

"(P. 692.) El que el Congreso no puede delegar facultades legislativas al Presidente, es un principio universalmente reconocido como vital para la integridad y sostenimiento del sistema de gobierno ordenado por la Constitución. La ley de octubre 1, 1890, en el extremo en discusión, no está en pugna con ese principio. No reviste al Presidente, en un sentido verdadero, con poderes legislativos."

En el caso de *Buttfield* v. *Stranahan,* 192 U. S., 470, una ley del Congreso declaró ilegal el que cualquiera persona * * * importara * * * cualquier mercancía, como té, que fuera inferior en su pureza, cualidad o aptitud para el consumo a los tipos fijados en la sección 3 de la ley. Y la sección 3 disponía que el Secretario del Tesoro, por recomendación de dicha junta (de peritos en té), debería fijar y establecer tipos uniformes de pureza, cualidad y aptitud para el consumo de todas clases de tés importados. Los tés fueron clasificados por el Secretario del Tesoro en trece clases. Se resolvió que el poder delegado al Secretario del Tesoro para fijar el·tipo de tés inferiores no fué ilegalmente delegado por el Congreso. La corte por medio de su Juez hoy Presidente Sr. White, dijo:

"(P. 496.) La alegación de que la ley sujeta a la arbitraria discreción del Secretario del Tesoro la determinación de cuáles tés pueden importarse y que por consiguiente de hecho inviste a este funcionario de poder legislativo, no tiene mérito alguno. Somos de opinión que la ley aplicada propiamente, como se dijo por la Corte de Apelaciones de Circuito, sólo expresa el deseo de excluir las clases inferiores de té, aunque fuesen demostrablemente de inferior pureza, inservibles para el consumo público, o que se presumiese así a causa de su inferior calidad. *Esto, en efecto, era la fijación de una base como norma, y recaía en el Secretario del Tesoro el mero deber ejecutivo de efectuar el programa legislativo declarado en la ley.* El caso está dentro del principio del caso de *Field v. Clark,* 143 U. S., 649 * * * . El Congreso legisló acerca de la materia en tanto era razonablemente práctico, y por las necesidades del caso fué obligado a dejar a los funcionarios ejecutivos el deber de obtener los resultados indicados por la ley. Negar el poder del Congreso para delegar este deber, en efecto, implicaría solo declarar que el poder plenario investido en el Congreso para regular el comercio extranjero no podía eficazmente ejercitarse."

En el caso de *Union Bridge Co.* v. *United States,* 204 U. S., 364, una ley del Congreso imponía la obligación al Secretario de la Guerra de exigir que todos los puentes fuesen alterados "siempre que el Secretario de la Guerra tuviese razón para creer que algún ferrocarril u otro puente * * * sobre cualquiera de las vías navegables constituía una obstrucción arbitraria para la libre navegación de tales aguas por razón de su altura insuficiente, etc. Se resolvió que la ley no era anticonstitucional por conferir poderes legislativos al Secretario de la Guerra. Se examinaron los casos sobre la materia en la opinión y se ratificó el principio de que era suficiente el que la legislatura fijara un tipo de norma. La corte dijo:

"(P. 386.) Sin duda, si el Congreso así lo desease, podría, de algún modo efectivo y sin previa investigación por conducto de funcionarios ejecutivos, determinar por sí mismo, primeramente, el hecho de si el puente en cuestión era una obstrucción arbitraria de la navegación y si se encontraba que era de tal carácter, podría por legislación directa haber exigido al demandado que hiciese las alteraciones en su puente que fuesen necesarias para la protección

de la navegación y comercio por la vía navegable en cuestión. Pero las investigaciones por el Congreso de cada puente en particular que se alegue que constituye una obstrucción arbitraria de la libre navegación y la legislación directa con respecto a cada caso por separado, sería impracticable en vista de los grandes y variados intereses que exigen de tiempo en tiempo legislación nacional. Por la ley en cuestión, el Congreso declaró en efecto que la navegación debe estar libre de obstrucciones arbitrarias procedentes de puentes de altura insuficiente, anchura de los tramos o por otros defectos. Sin embargo, se hizo punto en esta declaración de una regla general y se impuso al Secretario de la Guerra el deber de cerciorarse qué casos particulares caían dentro de la regla prescrita por el Congreso lo mismo que se le impuso el deber de implantar la regla en tales casos. Al desempeñar este deber, el Secretario de la Guerra sólo ejecuta la voluntad expresa del Congreso y en modo alguno en su verdadero sentido ejerce poderes legislativos o judiciales.''

En el caso de *St. Louis Railway* v. *Taylor,* 210 U. S., 281, una ley sobre aparatos de seguridad (*safety appliance law*) disponía que los vagones de carga estuvieran provistos de barras de tracción de altura uniforme. La altura uniforme habría de ser fijada por la Comisión de Comercio entre Estados por recomendación de la Asociación Americana de Ferrocarriles. Se resolvió que la ley no prescribía una delegación anticonstitucional de facultades legislativas.

En el caso de *United States* v. *Grimaud,* 220 U. S., 506, una ley del Congreso reservó ciertos terrenos forestales y dispuso que el Secretario de Agricultura debería dictar aquellas reglas y reglamentos y debería establecer el servicio necesario para asegurar los fines de tal reserva, cuales son el reglamentar su disfrute y posesión y el impedir la destrucción de los bosques. La infracción de cualquiera de las reglas establecidas por el Secretario de Agricultura constituía un delito. Al declarar que tal ley era constitucional la corte dijo:

'' (P. 517.) Desde el principio del gobierno varias leyes han sido aprobadas confiriendo a funcionarios ejecutivos el poder de dictar reglas y reglamentos, no para el régimen de sus departamentos, sino para hacer cumplir las leyes vigentes. Ninguna de estas leyes podían

conferir poder legislativo.  Pero cuando el Congreso legislaba y expre-
saba su voluntad, podía dar a aquellos que habían de actuar bajo
tales preceptos, el poder para establecer los detalles mediante la
promulgación de reglas y reglamentos administrativos, cuya infrac-
ción podía ser castigada con multa o prisión fijada por el Congreso,
o con penas fijadas por el Congreso, o calculadas por el daño causado.''

Cuestiones parecidas y resoluciones semejantes dió la
Corte Suprema de los Estados Unidos en el caso de *Red "C"
Oil Mfg. Co.* v. *Board of Agriculture of North Carolina,* 222
U. S., 380, y en el de *Interstate Commerce Commission* v.
*Goodrich Transit Co.,* 224 U. S., 194, y el alcance de la facul-
tad discrecional conferida a la Comisión de Comercio entre
Estados por la Ley de Comercio entre Estados se estableció
de nuevo en el caso de *Kansas City So. Railway Co.* v. *United
States,* 231 U. S., 423, en el cual la corte dijo:

''Aquí no hay ninguna delegación inconstitucional de poderes
legislativos.  Los razonamientos expuestos en el caso de la *Interstate
Commerce Commission* v. *Goodrich Transit Co.,* 224 U. S., 194, 210,
etc., son decisivos.  Y como se demuestra la uniformidad de la con-
tabilidad depende de la implantación y cumplimiento de clasifica-
ciones precisas y la autoridad para determinar los términos de esta
clasificación necesariamente se infiere, *puesto que después de todo
sólo significa el establecimiento de reglas generales de acción bajo
las cuales puede proceder la comisión y dejando a la comisión apli-
car estas reglas en casos y circunstancias particulares por el estable-
cimiento y cumplimiento de reglas administrativas.''*

Un caso de exacta analogía y que el demandado admite ser
de aplicación es el de *Ould & Carrington* v. *City of Richmond,*
23 Gratt. (Va.), 464, 14 Am. Rep., 139.  Se entabló una ac-
ción por Ould & Carrington contra la ciudad de Richmond
para recobrar contribuciones pagadas bajo protesta.  Las
contribuciones se cobraron en virtud de una ordenanza muni-
cipal que dividía a los abogados en seis clases, imponía una
contribución de patente de cierta cantidad a los abogados
de cada clase y le impuso el deber al Comité de Hacienda del
Concejo Municipal de clasificar los abogados en las clases

a que respectivamente pertenecieran. La sección 11 del estatuto disponía "que el Comité de Hacienda habría de clasificar cada persona y sociedad dedicada a los negocios mencionados en las secciones 3, 4, 5, 7 y 8, en las clases a que tal persona o sociedad correspondiera de acuerdo con la opinión de la comisión, teniendo en cuenta todas las circunstancias del caso." A la comisión se le ordenaba que notificara dicha clasificación por medio de anuncios en dos periódicos de la ciudad para que todas las personas que se creyeran injustamente clasificadas pudieran comparecer para corregir el error si existiera.

La validez de una ordenanza estableciendo una contribución de patentes parecida a la que se declaró válida en el caso citado contra la ciudad de Richmond, fué atacada y declarada válida en el caso de *Bradley* v. *City of Richmond,* 110 Va. 521, 66 S. E., 872. El caso fué apelado a la Corte Suprema de los Estados Unidos, la cual confirmó la sentencia. En este caso se discutió la interpretación de la enmienda 14 de la Constitución de los Estados Unidos, o lo que es lo mismo si hubo debido procedimiento de ley, y aunque la Corte Suprema de los Estados Unidos no entró a discutir en dicho caso la delegación de poderes legislativos, dijo:

(227 U. S., 481) "La objeción a la ordenanza no nace de ninguna disputa de que no existan distinciones justas y razonables que justifiquen una contribución mayor sobre algunas de las personas o sociedades que se ocupen en lo que se llama 'negociado de banca particular' que sobre otros que se ocupan del mismo negocio en general, sino que nace del hecho de que la ley no dispone reglas por virtud de las cuales algunos han de ser colocados en una clase y otros en otra. Una ordenanza que da a una junta, comisión o funcionario el poder de hacer una clasificación arbitraria para los fines de contribución, no llenaría ni los requisitos del debido procedimiento, ni tampoco el de la debida protección de la ley."

Sin embargo, el demandado alega que el poder para clasificar dado al Tesorero de Puerto Rico es arbitrario e injusto. Sostiene él que la ley no dispone que debe haber cinco clases

en cada industria y que no obliga al Tesorero a poner al menos una persona en cada clase. Sostiene además que el Tesorero podría clasificar todas las centrales azucareras de la isla en la primera clase y ajustarse así al poder que le ha conferido la ley. Que la legislatura no indicó si la línea divisoria de las distintas clases habría de ser la diferencia de un dólar o de diez mil dólares por año en el volumen de los negocios. El demandado sostiene que no se le han marcado límites al Tesorero para el ejercicio de su facultad discrecional y que la legislatura no ha fijado tipos de norma. Alega él que al Tesorero no se le exige que establezca algún hecho o hechos concretos, sino que tiene que determinar un número de hechos prácticamente para imponer la contribución.

No podemos comprender qué influencia puede ejercer el que en un caso se divida la industria en cinco clases y en otros en menos. Tampoco podemos apreciar qué importa el que el Tesorero esté investido de amplias facultades discrecionales siempre y cuando que tales facultades sean administrativas y no legislativas. El eje de la cuestión siempre es el si de acuerdo con las palabras de la ley y la historia legislativa del país las facultades delegadas han sido administrativas y no legislativas. Hemos citado un caso específico, o sea el de Ould & Carrington. El demandado no trata de establecer distinción entre ese caso y el de autos, sino que ataca sus razonamientos. Tal vez el razonamiento no sea enteramente satisfactorio, pero la sentencia es un hecho y una Corte de los Estados Unidos ha resuelto que facultades semejantes a las concedidas por la ley No. 134 al Tesorero de Puerto Rico son administrativas y no legislativas.

Examinemos la ley en sí. En primer lugar resulta de la misma que la contribución no puede exceder ni ser menos de un tipo fijado por la legislatura. La contribución ha de calcularse de acuerdo con el volumen de los negocios. Y debe ser proporcional a otros negocios parecidos en Puerto Rico. Es decir, la contribución debe ajustarse a un plan o proporción que depende de las clases fijadas en la ley, y si no fuera

así entonces sería arbitraria e injusta y podría recurrirse a los tribunales. Cuando exista una gran diferencia en el volumen de los negocios es evidente que al volumen mayor se le puede imponer la contribución al tipo mayor, siempre que se aplique un tipo igual a otros negocios semejantes, y en general a las industrias con un volumen menor de negocios se les impondrá una contribución proporcional. Tal vez la ley en conjunto no sea muy científica. La legislatura tal vez hubiera podido fijar tipos de norma más definidos. Tampoco podemos decir que el Tesorero siguiendo las reglas prescritas por la legislatura, dicte leyes porque estamos de acuerdo con el gobierno en que la ley ya está hecha. El Tesorero está sujeto a toda clase de limitaciones. No solo la ley le impone una limitación, como ya hemos dicho, sino que establece una apelación contra su resolución para ante una comisión de tres miembros de la cual él es uno. Poderes semejantes a los que se han concedido aquí al Tesorero se confieren con frecuencia a comisiones ferroviarias para fijar fletes de transportes por ferrocarriles y la constitucionalidad de esa delegación de poderes ha sido favorablemente resuelta en varios casos. *State* v. *Atlantic Coast Line R. Co.*, 47 Southern Rep., 969. *Trustees of Saratoga Springs* v. *Saratoga Gas Co.*, 122 App. Div., 214; *State* v. *Railroad Commission*, 100 Pac., 184; 8 Cyc., 834. El Juez Asociado Sr. Brewer en el caso de *Chicago and N. W. Railway Co.* v. *Day*, 35 Fed. Rep., 874, dijo:

"\* \* \* La Constitución del Estado de Iowa, lo mismo que las de otros Estados, divide el gobierno en tres departamentos, el legislativo, el ejecutivo y el judicial; y en el artículo 3, párrafo 1, declara que 'ninguna persona encargada de ejercitar poderes que propiamente pertenecen a uno, ejercitará funciones correspondientes a cualquiera de los otros.' En virtud de otro artículo el poder legislativo radica en una asamblea general compuesta de dos cuerpos, el Senado y la Cámara. No existen preceptos en la Constitución que creen una comisión ferroviaria. De aquí deduce el abogado que la legislatura es la única que puede fijar los precios de flete y que no puede aplicar sus funciones y delegar este poder legislativo a otro cuerpo. Por supuesto, esta es la cuestión decisiva; pues si sólo la legislatura puede

fijar los fletes, los comisionados de ferrocarriles están ejerciendo fun-
ciones que no les pertenecen: y si los fletes propuestos infringen
los derechos de propiedad del demandante puede él pedir que tales
funciones no autorizadas de los comisionados sean suspendidas.   No
siempre es fácil contestar un argumento tan claro y tan sencillo
cuando ambas proposiciones son en sentido general al menos verda-
deras.   Admite la fuerza del argumento y sin embargo no cree que
pudiera aceptar la teoría por estas razones: 1, es elemental que una
ley no puede ser declarada inconstitucional a menos que su defecto
sea evidente.   Como dijo el Juez Presidente Sr. White, en el caso
de Munn ya citado: 'toda ley se presume que es constitucional.   La
corte no debe declararla inconstitucional, a menos que claramente
lo sea.   Si existe duda, la voluntad expresa de la legislatura debe
ser respetada.'   O como se ha dicho en otra ocasión en forma epigra-
mática: 'la duda sostiene la ley.'   2. Tal delegación de poder no
tiene un viso inherente; no tiene nada que por su naturaleza pueda
impedir al Estado que al menos por un precepto constitucional im-
ponga tales deberes a una comisión; y no hay nada en tal precepto
constitucional que constituyera una invasión de los derechos garan-
tizados por la Constitución Federal.   Por tanto, después de todo, la
cuestión es más bien de forma que de fondo.   La cuestión vital tanto
para el embarcador como para el portador, es que los fletes sean
justos y razonables y no qué organismo es el que los pone en vigen-
cia.   3. Aun cuando en sentido general según las palabras del Tri-
bunal Supremo haya de concederse que el poder para fijar fletes es
legislativo, sin embargo, la línea divisoria entre las funciones legis-
lativas y administrativas no siempre son fáciles de distinguir.   La
una penetra en la otra.   Los libros de leyes están llenos de estatutos
que indudablemente son válidos en los cuales la legislatura se ha
contentado con simplemente establecer reglas y principios, dejando
su ejecución y detalles a otros funcionarios.   En este caso ha decla-
rado que los fletes deben ser razonables y justos y ha conferido, al
menos en parte, la simple administración de esa ley a una comisión
ferroviaria.   Supongamos que en lugar de declarar en términos gene-
rales que los fletes deben ser razonables y justos hubiera dispuesto
que los fletes debieran calcularse de tal modo que el portador des-
pués de deducir el costo del transporte recibiera el 3 por ciento sobre
la cantidad de dinero invertida en los medios de transporte y entonces
encargara a la comisión ferroviaria con el deber de fijar una tarifa
de fletes para llevar a la práctica ese precepto, ¿no serían las fun-
ciones investidas en tal forma a esa junta de carácter estrictamente
administrativo?   Aunque desde luego los casos no son exactamente

paralelos, sin embargo, el ejemplo indica cómo las funciones administrativas se rozan con el poder legislativo y convencen que aquello que participa en gran parte de un cargo meramente administrativo no debe ser declarado precipitadamente una delegación inconstitucional del poder legislativo. 4. Lo razonable de los fletes cambia con el cambio de las circunstancias. Aquello que hoy es justo y razonable seis meses o un año después puede ser o muy alto o muy bajo. La legislatura sólo se reune en determinados períodos; en este Estado una vez cada dos años. Es más probable que se haga justicia si este poder de fijar los fletes se impone a un organismo que continuamente pueda celebrar sesiones que si se impusiera a un organismo que sólo se reune en períodos determinados y en largos intervalos. Tal organismo puede cambiar los fletes en cualquier momento y hacer frente a cambio de circunstancias. Si bien es cierto que este argumento fundado en la inconveniencia no puede apurarse mucho, sin embargo es indudable que puede ser objeto de investigación el si teniendo en cuenta el aumento complejo de nuestra civilización y de nuestras relaciones sociales y comerciales, no es necesario reconocer el poder de la legislatura de dar mayor alcance a las funciones administrativas. 5. Las sentencias del Tribunal Supremo de este Estado que resuelven ceder delegación de poder pugnando con la Constitución del Estado deben ser aceptadas como definitivas en las Cortes Federales. Y una Corte Federal no debe apresurarse a declarar anticonstitucional lo que la Corte de Estado puede posteriormente declarar válido, especialmente cuando la Corte Suprema de algunos de los Estados hermanos ha declarado válidas disposiciones semejantes. Finalmente, las autoridades que directamente tratan esta cuestión sostienen esta delegación de poderes.

"En el reciente caso de *State* v. *Railroad Co.*, 37 N. W. Rep., 782, la Corte Suprema de Minnesota examinó esta cuestión y declaró válido un precepto semejante. Véase también el caso resuelto por la Corte Suprema de Nebraska de *State* v. *Railroad Co.*, 35 N. W. Rep., 118, y 36 N. W. Rep., 308. En el caso de *Tilley* v. *Railroad Co.*, 5 Fed. Rep., 641, el Juez Asociado de la Corte Suprema de los Estados Unidos, Sr. Woods, actuando como Juez de Circuito, también examinó esta cuestión en una opinión cuidadosamente redactada y declaró válido otro precepto parecido. Véanse también los otros casos citados en la opinión de la Corte Suprema de Minnesota ya citada. Pero aun más, en el caso de *Stone* v. *Trust Co.*, 116 U. S., 307, 6 Sup. Ct. Rep., 334, se discutió ante la Corte Suprema de los Estados Unidos la validez de una ley del Estado de Mississippi que delegaba poderes semejantes a una comisión ferroviaria y aunque se hizo esta misma

objeción por el abogado en contra de su validez, la ley fué declarada
válida.   Es verdad que no se mencionó expresamente esta cuestión
en la opinión y en ella se dijo que podrían presentarse otras cues-
tiones fundadas en partes de la ley que pudieran ser resultas des-
pués, así es que tal vez ese caso no pueda tomarse como una deter-
minación completa de esa cuestión por la corte; sin embargo, como
ya he dicho, todas las autoridades que han sido citadas o que yo he
podido encontrar y que tratan en concreto esta cuestión se pronun-
cian a favor de la constitucionalidad de tal delegación de poderes
Por estas razones yo sostengo que esta contención del demandante
es insostenible."

Tal vez nosotros también pudiéramos tener alguna duda,
pero como ha dicho el Juez Asociado Sr. Brewer "la duda
sostiene la ley." El deber de un tribunal de seguir la volun-
tad de la legislatura, a menos que claramente resalte la incons-
titucionalidad de la ley fué declarado por nosotros en el caso
de *Ponce Lighter Company* v. *Municipio de Ponce et al*, 19
D. P. R., 760 y 790, y en las citas recopiladas en él.

III. El demandado sostiene que el acto es imposible de
ejecutar.   La teoría del demandado, al parecer, es que la con-
tribución en caso de ser exigible lo fué de acuerdo con la ley,
el 1º. de enero de 1914; que como en dicha fecha el Tesorero
no había obtenido de la Miramar Shop Company el certificado,
no puede exigir el pago de la contribución que venció el pri-
mer día del año; que a las personas nombradas en la ley
se les prohibe explotar negocios hasta que han pagado la
contribución; que el Tesorero no promulgó sus reglamentos
para las contribuciones que vencieron el 1º. de enero de 1914
hasta el 23 de enero de 1914; que por razón de estos precep-
tos y actos contradictorios es imposible ejecutar el acto.

Si se examina la sección 3 de la ley se observará que a
las personas, de acuerdo con ella, se les prohibe explotar nego-
cios "hasta o a menos que" la correspondiente contribución
de patente haya sido pagada.   Según la sección 4, la contri-
bución vence el día 1º. de los meses de enero, abril, julio y
octubre de cada año.   Es cierto que el Gobierno trata de
cobrar la contribución que venció el 1º. de enero de 1914, pero

es necesario dar a la ley una interpretación razonable. Si el Tesorero por no tener datos suficientes para ello no ha cobrado la contribución que venció el 1° de enero de 1914 y que de acuerdo con las secciones 9 y 10 de la ley él está autorizado para exigir a la Miramar Shop Company, el mero hecho de que no haya cobrado esa contribución a su debido tiempo no le impide el exigir el pago cuando llegan a su poder los datos. La sección 3 dice: "hasta o a menos que" la contribución se haya pagado, y de acuerdo con la ley una persona no tiene derecho a explotar sus negocios "a menos que" haya pagado su contribución, pero no puede decirse que haya omitido pagarla, hasta que tal contribución haya sido determinada. Las palabras "a menos que" indican que la contribución no puede exigirse hasta que esté debidamente fijada. Pero la resistencia opuesta por la Miramar Shop Company a dar los datos necesarios, no impide al Tesorero el cobrar contribuciones atrasadas al tiempo de obtenerse dichos datos. Al parecer, la contribución sobre los bienes inmuebles se cobra del mismo modo. El hecho de que una ley sobre contribuciones ectúe retroactivamente no implica por necesidad el que sea anticonstitucional según ha dicho la Corte Suprema de los Estados Unidos en el caso de *Billings* v. *United States,* 232 U. S., 261, y el que sea necesario ejecutar algún acto después que vence una contribución para poder determinar su importe no impide el que se cobre. El Tesorero estaba autorizado para exigir estos datos y la Miramar Shop Company estaba obligada a suministrarlos. Los reglamentos dictados parecen razonables y la impugnación que se les hace carece de importancia.

Debe expedirse el auto perentorio de *mandamus.*

> *Concedida la solicitud y ordenada la expedición de un auto perentorio de* mandamus *contra el demandado para que dentro del término de diez días presente el certificado jurado exigido por el Tesorero de Puerto Rico.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados del Toro y Aldrey.

El Juez Asociado Sr. Hutchison no formó parte del tribunal en la vista de este caso.